Filed 2/11/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,      )
     )
     Plaintiff and Respondent,      )
     )      S143743
     v.      )
     )
HUBER JOEL MENDOZA,      )
     )      Stanislaus County
     Defendant and Appellant.      )      Super. Ct. No. 1034046
_____ )

A jury found defendant Huber Joel Mendoza guilty of the first degree premeditated murders of Alicia Martinez, Carlos Lopez, and Carmillo (Camarino) Chavez (Pen. Code, § 187),[1] and found multiple-murder special-circumstance allegations to be true (§ 190.2, subd. (a)(3)), as well as allegations that in each offense defendant used a firearm, inflicting great bodily injury or death. (Former § 12022.53, subd. (d).) The jury also convicted defendant of shooting at an occupied building. (§ 246.) Finally, the jury convicted defendant of assault with a firearm on Guadalupe Martinez (§ 245, subd. (a)(2)) and found true firearm use (former § 12022.5, subd. (d)), and great bodily injury (former 12022.7, subd. (a)) enhancement allegations.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

Prior to the guilt phase of trial, a separate jury returned a verdict finding defendant competent to stand trial.

Subsequent to the guilt phase of trial, a sanity trial was conducted and the jury returned a verdict finding defendant sane at the time of the offenses.

At the penalty phase, the jury returned verdicts imposing a penalty of death. The trial court sentenced defendant to death for the multiple murders and to a stayed term of 17 years in prison for the noncapital offenses and enhancements. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Guilt phase

#### 1. Prosecution evidence

Defendant's responsibility for the killing of three persons and injury of a fourth was not disputed. Evidence regarding the crime came principally in the form of testimony from the surviving victim, Guadalupe Martinez; from defendant's estranged (and later divorced) wife, Cindi Martinez; from ballistics experts; and from items seized from defendant's van and residence.

The evidence showed that about 3:00 o'clock in the morning on December 12, 2001, defendant arrived at the home of Cindi's family in Modesto. Cindi did not live there, but her parents Alicia and Jose Luis Martinez, younger sister Guadalupe Martinez, cousin Carlos Lopez, and Cindi's boyfriend Carmillo (known to the witnesses as Camarino) Chavez, did. Defendant was attired in a bulletproof vest, helmet, and camouflage pants, and was armed with three semiautomatic firearms and a large quantity of ammunition. After knocking off the handle of the front door with a heavy instrument, he broke the front picture window of the home and entered the living room. He fired multiple shots at

2

Carlos Lopez, who had been sleeping on the sofa and fled as far as the nearby kitchen before defendant shot him to death.

Defendant proceeded down the hall to Camarino's bedroom, where he shot through the door and then also shot Camarino at close range, killing him. Guadalupe testified that before hearing the shots in Camarino's bedroom she heard defendant yelling that "you're messing with the wrong guy" and that "you should not have messed around with a married woman."

The flying bullets had penetrated Guadalupe's bedroom and she found that she had been shot in the arm. Guadalupe, then 16 years old, cried out for her mother. Defendant called her name, asking if she was injured. He spoke in a normal tone, trying to convince her to open her door. Guadalupe refused, but then tried to open the door, which was jammed. Defendant directed her to move aside and he forced the door open. He instructed her to get on her bed and cover herself, but she refused, thinking he would kill her. He asked where her parents were. She responded that she did not know, but that her father may have left for work.

Defendant walked down the hall to the parents' bedroom. He tried to convince Guadalupe's mother, Alicia, to come out of the bedroom. When she refused, defendant directed Guadalupe to ask Alicia to open the door, promising not to hurt her. Guadalupe complied. The door opened, and Guadalupe saw defendant push Alicia down the hall to the living room. Alicia was weeping, asking what he was going to do to them, and asking him not to hurt Guadalupe. When defendant, Alicia, and Guadalupe arrived in the living room, defendant asked how Alicia could permit Cindi to see someone else while she was still married to defendant, especially to meet the man at her home. Alicia responded that she had told Cindi she did not approve of her relationship with Camarino, and would never approve of her starting another relationship when she was still

3

married. Alicia told defendant she loved him. Defendant shot her in the head, killing her.

Defendant asked Guadalupe where her father was, and Guadalupe again said she thought he had left for work. Defendant searched the master bedroom, but did not find Jose Luis, who had fled outside.

Guadalupe then asked defendant to take her to a hospital for treatment. At first he tried unsuccessfully to telephone 911 on her behalf, then agreed to drive her to the hospital. They entered defendant's van and drove away, but not in the direction of the hospital.

Defendant telephoned Cindi who lived apart from defendant. Guadalupe heard him tell Cindi he had killed all of her family and that she would be next. Defendant's oldest son called defendant back and asked him not to hurt Guadalupe. Defendant then drove to his brother's house, stopping in front of the house and telephoning to say that he had committed a terrible crime and that he was going to leave the brother $11,000 in cash wrapped in a diaper. He threw a white diaper through the window and drove off, again not in the direction of the hospital.

Guadalupe repeatedly asked to be taken to a hospital. A bone in her arm had emerged through the skin. Defendant ultimately drove to the hospital, parked the van, and opened the door for her. She walked to the emergency room, where she was treated for severe gunshot injuries to her arm.

Guadalupe testified that she had liked defendant, who always had been nice to her, although he did not spend much time at family gatherings. Defendant spent most of his time with his sons, whom he referred to as his "angels." Guadalupe explained that she had never seen him yelling before the night of the crimes, and even then, he acted normally when he spoke to her. She acknowledged that at the preliminary hearing she had testified that at the time of the crimes, defendant did

4

not seem like the person she had known all her life, but that when they were in the van, defendant seemed to return to his more normal demeanor. She testified at trial that he started crying after speaking with his son and repeatedly apologized to her. He told her he wanted her to take care of his angels.

A uniformed hospital security guard, Eustaquito Ramos, testified that having been informed that a gunshot victim had been admitted and that the person who brought her could be in a van in the parking lot, he went outside to the lot. Defendant approached, asking to speak to him. Defendant stated that he had just shot his mother-in-law a few minutes earlier and wanted to turn himself in. He handed Ramos some handcuffs. When Ramos asked why this had happened, defendant said he did not want to say anything else. Defendant's demeanor was cooperative and calm.

Ballistics evidence indicated that 73 rounds had been fired at the scene of the killings. There were fifteen 7.62-caliber rifle rounds outside the house in the flower bed. There was broken glass in the living room, the kitchen, and down the hallway. On a coffee table in the living room, officers found a Russian SKS 7.62-caliber assault rifle. The safety was off and the weapon had been fired until it was empty. There was an empty 30-round magazine clip inserted in the weapon. On a chair in the living room was a Ruger P-89 nine-millimeter semiautomatic handgun with a magazine holding 10 rounds. The slide was in a "clocked back" position and the weapon had been fired until it was empty. Also in the living room was a .45-caliber magazine for a Colt .45 handgun. The weapons and magazines all were empty. There were eleven 7.62-caliber rounds and one expended .45-caliber shell casing in the living room.

There were nine-millimeter shell casings in the kitchen and in the hallway, along with bullet holes in the walls. Seventeen rounds had entered Guadalupe's bedroom. Thirteen bullets had been fired from outside Camarino's bedroom into

5

the room.  In addition, seven nine-millimeter shell casings and two .45-caliber shell casings had been fired from inside Camarino's room.  Additional expended shell casings and bullets were found in the master bedroom.

When police officers searched defendant's van after the crimes, they discovered a military-style helmet and two ballistic vests.  A nine-millimeter magazine was on the floor in the front of the vehicle.  Also discovered were a flashlight, nylon rope, handcuffs, a gas mask, a stack of photographs, an empty handgun case, and a sledgehammer.  In the van, there was also a leather jacket with a roll of duct tape in the pocket.  The Colt .45 handgun used in the crimes was also discovered in the van.

According to firearms expert James Hamiel, the three weapons used in the crimes were semiautomatic and had an average trigger pull.

After defendant was arrested, he was examined and found not to be under the influence of drugs or alcohol.  When he was approached to undergo testing, he had his head in his hands, but his demeanor was "conversational," he responded "appropriately," and seemed to understand directions.

A search of defendant's home disclosed boxes of ammunition along with sales receipts and licenses for the Colt .45 handgun, the Ruger nine-millimeter, and the assault rifle that were used in the murders.  The weapons had been acquired legally some years prior to the crimes; the Ruger and the assault rifle were registered to defendant and the Colt .45 handgun was registered to Cindi.  The house was in a state of great disorder.

Cindi Martinez testified, confirming that she received a phone call from defendant in the early morning hours of December 12, 2001.  He said he had just killed her whole family.  He said he was coming to her apartment, and she reminded him that the children were with her.  She called her mother's house and, receiving no answer, she called 911 and spoke to an operator.  A transcript of the

911 call was received in evidence and the tape recording was played for the jury. Defendant also made another call to Cindi's apartment and spoke to their oldest son.

Cindi was aware that defendant had firearms. He used a refrigerator in his bedroom to store the weapons and ammunition. She also knew defendant owned a helmet and ballistic vest resembling the items in evidence. They had been married about 15 years. Even before her recent departure from the family home, where defendant still resided, they had had separate bedrooms and had not been intimate for some time. There was also about $10,000 in cash in the family home. At the time of the crimes, defendant had not worked for five or six years. She worked two jobs and paid him to care for their three children.

On cross-examination, Cindi testified that defendant never threatened her or hit her, and she said that the tragedy came out of the blue. On redirect, she acknowledged they had argued and once he pushed her and put his hands on her throat. She denied telling police that defendant threatened that if she did not leave their house, he was going to kill her.

### 2. *Defense evidence*

The defense theory was that defendant had not premeditated the killings. In support, the defense introduced evidence involving an emotional encounter defendant had at his son's school and an assertedly distressing visit to his home by school authorities shortly before the crimes.

On December 10, 2001, two days before the murders, defendant was at his youngest son's elementary school wanting to take the boy home. (The couple's three sons then resided with defendant.) The boy was in first grade and had been absent frequently. The school principal, Nancy Jones, testified that when she heard defendant was apparently in a distraught mood, she intervened. She urged

7

defendant to let the boy stay, but he became more upset, saying that when children grow older they "sometimes became corrupt." He said he did not want to leave his son at school, and that when children are young they are like angels but when they grow up they become corrupt. She recalled that he said the world was evil and he did not trust the government. He then started crying. She permitted him to take his son with him but planned to contact him because he seemed depressed and she was worried about his children. Jones testified that his son cried a great deal in school and for that reason had been sent home frequently. All of defendant's children were good students and were well dressed and well behaved.

On the following day, December 11, 2001, Jones went with School Resource Deputy Sheriff Jaime Jiminez to defendant's home for a meeting with defendant, Cindi, and their three sons, including the oldest, who then attended middle school. Jones and Jiminez tried to focus on the issue of school attendance, but defendant kept rambling about other issues, including his wife's absence from the home and his desire that she return there. He was very upset and acknowledged having felt suicidal. Jones found the discussion strange. At one point Cindi commented that the couple had not had a real marriage for years and defendant said even though he did not love her, she should move back home. Jones thought the situation was serious and she had concerns about the boys' safety. Defendant seemed depressed and angry. When he wept, the children were very loving to him. The oldest son behaved like a caretaker for his father. She asked defendant to let the children go live with Cindi, and in the end he agreed. They all departed and he was left alone.

School Resource Deputy Sheriff Jiminez testified about the December 11 home visit, explaining that he had telephoned defendant concerning his youngest son's absences from school and defendant talked about his problems with his wife and children. Defendant spoke of mistrusting the government, the police, and the

8

school district, which he considered corrupt. Defendant stated that he had a right to keep his son at home and disputed Jiminez's advice to the contrary. Jiminez offered to look into counseling for him. When defendant asked that they meet at his home along with Cindi and the three children, Jiminez agreed. When Jiminez arrived for the meeting the house was tidy. Defendant talked about his marriage, his wife's absence, and his children's awareness of her boyfriend. Defendant was emotional and wept; it was very difficult to maintain his focus on the subject of his son's school attendance. The children were clinging to him. When Jones asked defendant if he felt suicidal, defendant responded that he had felt that way from the age of 24, but had not acted because he had to raise his children. Jiminez offered to find defendant a divorced fathers' support group, and defendant was receptive. Shortly after the meeting defendant telephoned him asking for information about the support groups, but Jiminez said he was still working on it.

### B. Sanity phase

Dr. Pablo Stewart, a psychiatrist retained by the defense, evaluated defendant in the summer of 2003, meeting with him nine times over a period of two years. Dr. Stewart concluded that at the time of the crimes defendant was suffering from a long-standing and untreated major depressive disorder with psychotic features and that, although defendant was aware of the nature of his acts, he was not able to distinguish right from wrong during the commission of the crimes. Dr. Stewart believed that defendant began to be able to appreciate the difference between right and wrong while he drove his van away from the crime and spoke to his son on the telephone. The witness also believed defendant had been operating under a psychotic delusion that it was necessary to commit the crimes in order to protect his children from harm.

9

Dr. Robin Schaeffer, a clinical psychologist retained by the defense, met with defendant on 26 occasions beginning in July 2002 and continuing for more than three years. He agreed with Dr. Stewart's diagnosis and conclusion that because of defendant's mental illness, specifically his delusion regarding the necessity to act to protect his children from harm, defendant was not able to distinguish right from wrong when he committed the crimes.

Dr. Wendy Weiss, a clinical and forensic psychologist appointed by the court to evaluate defendant's sanity, interviewed defendant on one occasion in July 2005. She diagnosed defendant as suffering from major depressive disorder with psychotic features but believed he had appreciated the nature of his acts and understood the wrongfulness of his behavior during the commission of the crimes. Thus she believed that he had been sane at the time of the crimes.

Dr. Jonathan French, a psychologist appointed by the court to evaluate defendant's sanity, interviewed defendant in October 2005, diagnosing him with major depression, but he did not find any psychotic symptoms. Dr. French thought defendant was sane at the time of the crimes.

Dr. Philip Trompetter, a psychologist retained by the prosecution, had been present to observe the jail interview conducted on the morning of defendant's arrest, and concluded that defendant was depressed. Dr. Trompetter did not observe defendant display psychotic features or evidence of delusions or hallucinations. He did not see any sign of major mental illness other than depression. He believed defendant was distraught. The witness would not expect to see symptoms of mental illness vary from hour to hour unless the person had been medicated. Dr. Trompetter spoke with defendant in jail the day following the interview and defendant stated he did not have hallucinations and denied suicidal thoughts, saying he was "mentally strong." Defendant terminated the interview.

10

The jury viewed a videotaped recording of the interview conducted with defendant by Detectives Craig Grogan and Jon Buehler on the morning of defendant's arrest, as well as recordings of defendant's telephone conversations with relatives while he was in jail. (These, along with jail medical records and other materials, also were reviewed by the expert witnesses.)

At the beginning of the interview defendant asked for a hamburger, explaining that he had not eaten in three days. During the interview defendant admitted the acts demonstrated by the prosecution evidence, but stated that he believed his actions were made necessary by threats to his sons' well-being posed by their grandparents and the presence of Camarino Chavez, his wife's lover, in the grandparents' home. Defendant said "they were taking my kids away, together with my wife" and he said that if she had been concerned for their children "how can you take them to that house, in your own parents' house?"

The interview was marked by rambling statements about the nature of these threats and the need he felt to protect his children and all children from corruption. Defendant said he wanted to help the children and "[t]hat's why probably [I] did what I did . . . . I can't control what's in me." He said he wasn't crazy, but wanted to be with his sons, having "seen generations going down this little black hole, because their parents couldn't take care of them." He said he was "mad with [his] pain as a man" and that his wife's affair hurt their children. Their sons saw her hugging "that man." He said he had been out of his mind and "it was like thinking and not thinking" when he went to the scene of the shootings.

Defendant also made comments indicating that he felt he had been a coward previously. At intervals he wept and talked to himself. He did not deny that he had brought the weapons and protective gear to the scene. He added that he had no record of violence. He thought the men of the house would be armed. He just wanted to talk to his in-laws. He knocked on the door and got no answer.

11

"Then I went back to the van, I got the rifle and I got [the pistols]" and the hammer. He knocked again, and someone cursed and told him to go away. He broke the window with his hammer in order to enter the house. He thought perhaps the man inside was pulling on his rifle. He started shooting as he entered. He explained that when he was denied entry he "lost [his] mind" and wanted to force the residents to talk to him. He had been upset and angry, feeling that his in-laws were against him. He felt psychologically threatened by them. He said he "never went with the intention of hurting nobody. I just wanted to make it stop . . . ."

Defendant made statements indicating he knew that what he had done was wrong. (E.g., "Oh I know why I did, it was bad choice and its wrong for them [his children]"; "I love my kids and they deserve better. I mean I probably did the wrong thing"; "they should have talked to me and I should ah, ah, never used a firearm, so just go away or, but I just kept doing it. I just kept doing it, because they were mak[ing] me upset, because they wouldn't talk to me"; "I know I did the wrong thing.") He said, "I realize what I have done . . . but I just, I felt like that my kids needed me, sir. That's why I haven't killed myself because my kids need me." He said: "And then [after] the first shot he just run away and I didn't know exactly where, like I said I just lost control of myself and I felt like turning and I shouldn't do that, I shouldn't go in there for them with firearms, I understand that, but I was just, I was desperate and then I wanted to talk to them and . . . I needed for them to stop what we're doing, because I from bottom of my heart I knew that wouldn't stop at all, but I still wanted to talk to them and they wouldn't listen, I will do whatever it took." When asked about the vest he explained "the vest is ah, is because I say to myself okay, I love myself. I don't wanna kill myself, but if I'm gonna die, I'm gonna take at least so many people with me, that much as I can, because [interruption]." He further explained: "I just, I talk to myself a lot, I

12

just said if I come to a point that I have to defend, defend, defend myself or, or, or just do something that probably look not good on me, but do something that is not go back again, like kill somebody I will just kill as much as I can and then they can kill me.  Because I didn't feel like staying this, this world. . . .  So when this guy run I started shooting like how you call it, random way."  He continued:  "I was so blind that I, my head, my head was like this . . . ah I said what's the point and ah I have been pushing myself to get to this point, well let's go to the end."

In the tape-recorded phone conversations with family members during the interview, defendant said he did not have bad intentions but that his children were being hurt and he couldn't take the pain and would fight for them.  Defendant spoke with his oldest son during the police interview.  The boy asked, "Why did you do it?" and defendant answered, "I know my son, I'm not proud of it.  I'm not proud of it my son, but, it was something that it had to be done.  I wanted to protect you."  He went on:  "I don't feel . . . proud of what I did.  But uh, I just trying to do the best for you my son. . . .  I don't want anyone to take your innocence."

In subsequent phone calls to relatives, defendant continued the theme of the threat to the innocence of his children and his pain at his separation from them.  He was particularly distressed that his children had witnessed their mother and her lover hug and kiss.  He said he had done nothing wrong.  His former sister-in-law, Patricia Gonzalez, accused him of lying and pretending he was crazy.  Defendant said:  "I am not crazy!"  She suggested his attorneys were saying that he was.  Defendant answered:  "Well, that is the attorney's and the district attorney's and all of us's game . . . because we agreed.  We are playing with that."  She said she knew he was sane, and defendant agreed.

The jury, after asking on several occasions that testimony be reread, concluded that defendant had been sane at the time of the crimes.

13

## C. Penalty phase

Alicia's daughters Patricia Gonzalez, Maria Pulido, and Guadalupe Martinez, and Alicia's husband Jose Martinez described the painful impact on them of her death, and that of Carlos Lopez on them and other members of the extended family. Patricia Gonzalez and Guadalupe Martinez also described murder victim Camarino Chavez's good qualities. Guadalupe further testified concerning the trauma she experienced herself as a victim and witness of the crimes, and the ongoing difficulties she faced as a result.

Several of defendant's siblings and persons who had known him from childhood in Mexico testified about the circumstances of defendant's upbringing and his good qualities including kindness, especially with children. They described the changes in his personality from about 1998, when he became mistrustful and unhappy, and testified that they believed he was mentally ill when he committed the crimes. Defendant's two older sons described the excellent, loving care their father had given to them, and expressed their love for him and their desire that his life be spared. Dr. Rodney Erwin, a psychiatrist, found defendant's sons all very attached to him as their primary caregiver. Dr. Erwin recounted episodes in which defendant exhibited excellent parenting, adding that in his view, the boys had been able to overcome the trauma of the crimes. Dr. Pablo Stewart again testified that he believed the crimes were caused by defendant's mental illness. Daniel Vasquez, a correctional consultant and former warden of San Quentin Prison, described conditions in prison and opined that defendant was a model inmate and would not present a risk of violence in prison.

The jury returned a verdict of death.

14

## II.  ISSUES

### A.  Challenge to the competency verdict

In November 2003, defense counsel Kent Faulkner and Greg Spierling notified the court that they believed defendant was incompetent to stand trial. They added that Dr. Pablo Stewart, psychiatrist, and Dr. Robin Schaeffer, psychologist, had examined defendant at their request and concluded he was not competent.  The court suspended proceedings pursuant to section 1368 and appointed Dr. Gary Zimmerman, a psychologist employed by the Department of Corrections who had performed hundreds of competency evaluations, to examine defendant.  After various continuances, a jury was empanelled and a competency trial commenced in early December 2004.  After several days of proceedings, the jury returned a verdict finding defendant competent to stand trial.

Defendant contends that there was insufficient evidence to support the jury verdict finding him competent, and that he therefore was denied rights under the state and federal Constitutions' due process clauses.  He also argues that the trial court employed the wrong standard when it denied his motion for judgment notwithstanding the jury's verdict on competency.  We are not persuaded.

#### 1.  Applicable law

"The United States Supreme Court has 'repeatedly and consistently recognized that "the criminal trial of an incompetent defendant violates due process." ' [Citation.]  A defendant is deemed incompetent to stand trial if he lacks ' " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him.' " ' [Citations.]" (*People v. Lightsey* (2012) 54 Cal.4th 668, 690 (*Lightsey*).)

15

"The applicable state statutes essentially parallel the state and federal constitutional directives.  Section 1367, subdivision (a) provides:  'A person cannot be tried or adjudged to punishment while that person is mentally incompetent.  A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' " (*Lightsey*, *supra*, 54 Cal.4th at p. 691; accord, *People v. Jablonski* (2006) 37 Cal.4th 774, 808.)

When the defendant puts his or her competence to stand trial in issue, the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence.  (§ 1369, subd. (f); *People v. Ary* (2011) 51 Cal.4th 510, 518; *People v. Dunkle* (2005) 36 Cal.4th 861, 885, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *Medina v. California* (1992) 505 U.S. 437, 446 [this burden of proof does not offend federal constitutional principles].)

We apply a deferential substantial evidence standard of review on appeal.  "In reviewing a jury's determination that a defendant is competent to proceed to trial, we give due deference to the trier of fact, and therefore view the record in the light most favorable to the verdict." (*People v. Frye* (1998) 18 Cal.4th 894, 1004, (*Frye*); accord, *People v. Marshall* (1997) 15 Cal.4th 1, 31 (*Marshall*); *People v. Samuel* (1981) 29 Cal.3d 489, 505 (*Samuel*).)  When the sufficiency of the evidence to support the verdict is challenged, our review is limited to the evidence presented at the competency trial.  (*People v. Marks* (2003) 31 Cal.4th 197, 219, fn. 3 (*Marks*).)  As we shall explain, we believe that the verdict of competence was supported by substantial evidence.

*2. Facts*

*a. Defense evidence at the competency trial*

The defense sought to carry its burden of proof through testimony of mental health experts who testified regarding defendant's mental illness, his religious preoccupation, and his asserted inability to engage rationally with the experts regarding the offenses or the trial. The court-appointed expert, Dr. Zimmerman, testified that as a result of his November 2003 examination of defendant, he believed defendant was incompetent. Dr. Zimmerman believed defendant was then suffering from depression that made him "seriously impaired" and in fact so indifferent to the trial that he could not "rationally work with his attorney" to assist in the preparation and presentation of his defense. According to Dr. Zimmerman, defendant refused to discuss the facts of the case and did not appear to be exaggerating his symptoms.

On the other hand, Dr. Zimmerman found that defendant was not delusional and reported that defendant did not break down in tears and was not then taking medication. Dr. Zimmerman testified that defendant said he was able to talk to his attorney about the case and he understood that he was charged with murder and was facing the death penalty.

Dr. Pablo Stewart, the psychiatrist retained by the defense, had served as a consultant under appointment in federal courts and was also employed by the Haight-Ashbury Free Clinic in San Francisco.[2] He testified that when, in November 2003, he interviewed defendant and administered the MacArthur Competency Test, it was evident to him that defendant was then incompetent. At that time he displayed "amazing" mood fluctuations and, moreover, when Dr.

---

[2] Dr. Stewart spoke Spanish and offered to perform interviews with defendant in that language, but defendant preferred English.

Stewart tried to direct defendant's attention to questions concerning defense counsel and the function of the court, defendant supplied no focused answers. Rather, defendant at first appeared to speak to the questions, but quickly rambled away from the point to discuss generalities and religious concerns. At that time he scored very poorly in each element of the MacArthur Competency Test. Dr. Stewart testified that not just in November 2003 but also in subsequent interviews in February, April, July, and November 2004, defendant started to reply to questions but quickly moved on to statements expressing delusions focusing on religion and exhibiting paranoia, including fears directed toward defense counsel.

Dr. Stewart believed that defendant suffered from a long-standing severe mood disorder, namely depression, which included psychotic features. In Dr. Stewart's later interviews with defendant, the mood disorder endured and the psychotic symptoms became, "if anything," worse. Whereas in November 2003 Dr. Stewart believed defendant was aware of the seriousness of the charges, in November 2004 this was no longer the case and, in Dr. Stewart's view, defendant did not appear to understand what the charges were. Defendant responded to questions about the charges by discussing unconnected topics. In the November 2004 interview, Dr. Stewart observed defense counsel Spierling attempt to ask defendant a few routine questions, but noticed that defendant did not "interact" with counsel. Dr. Stewart concluded that because of the depression with psychotic features, defendant was unable to evaluate witness testimony or help select a jury, that he had no insight regarding what led to the crimes, nor could he help counsel develop the case in mitigation.

Dr. Robin Schaeffer, the clinical psychologist retained by the defense, conducted a taped competency evaluation interview with defendant just a few days before the competency trial. Dr. Schaeffer concluded defendant was not competent to stand trial. The witness testified that in his opinion, defendant

18

suffered from a psychotic thought disorder, that when he needed to answer questions concretely or specifically, he answered them very generally and rambled, and that his mental illness rendered him unable to think in a logical way. The witness also concluded that because of the psychosis, defendant had "delusional grandiosity," a paranoid level of distrust, and a sense that the trial was unreal and did not matter." According to Dr. Schaeffer, defendant's preoccupation with general religious thoughts made him unable to respond to questions with any specific answers, and caused defendant to believe that the actual trial was not his true trial. For these reasons, the witness believed, defendant would be unable rationally to assist counsel in his defense, make decisions about testifying or waiving jury trial, understand a plea negotiation, or assist in formulating a defense at the guilt or penalty stages of the trial.

Dr. Schaeffer acknowledged that sometimes defendant was able to answer questions, that defendant sometimes "can be of some assistance to counsel," and that many of defendant's responses were not completely irrational. The witness testified that, nonetheless, the overall interview demonstrated defendant's inability to stay on track in a manner that would be sufficient even if the charges had been much less serious, because defendant "can't with any consistency be rational, because his brain repeatedly throws him into the abstract . . . and causes him to ramble."

A recording of Dr. Schaeffer's December 2004 interview with defendant was played for the jury and a transcript was admitted into evidence. The tape recording exhibited defendant's rambling, disconnected answers to questions, as well as his distrust and his religious preoccupation. His answers evinced some understanding of the proceedings but an aversion to engaging with them.

The defense also presented testimony by Robert Wildman, an experienced criminal defense attorney who was not involved in the case. He described the

19

impediments to a defense counsel's performance that would arise when a defendant's mental state prevented him or her from assisting counsel in various ways.

### b. *Prosecution evidence at the competency trial*

The prosecution presented expert testimony and other evidence suggesting that defendant had the capacity to engage rationally in the defense, but chose not to do so. Dr. Gary Cavanaugh, a psychiatrist in private practice who also had a substantial forensic practice and taught at the University of California, Davis, was retained by the prosecution. He testified that based on his February 2004 interview with defendant, he found defendant competent to stand trial at that time. Dr. Cavanaugh reviewed the earlier written reports by Drs. Schaeffer, Stewart, and Zimmerman, along with jail mental health records, police reports, the transcript of the interrogation of defendant in jail, and recordings of defendant's recent phone conversations. Dr. Cavanaugh believed defendant was capable of understanding the nature of the proceedings and assist counsel in the defense. In forming his opinion, the witness relied in part on defendant's answers to questions regarding his orientation to time and place, and on his ability to make abstract determinations and engage in higher levels of thinking, both inconsistent with severe mental illness. Dr. Cavanaugh also based his opinion on defendant's statements concerning the function of persons involved in the legal proceedings, especially defense counsel and the prosecutor.

Dr. Cavanaugh noted defendant's preoccupation with religion but did not find it delusional in the sense of being a fixed false belief that does not relate to a person's culture and is not modifiable by reason. Rather, Dr. Cavanaugh found the religious preoccupation authentic. Dr. Cavanaugh believed defendant had grasped examples he had given of alibi, mistaken identity, or mistake of fact

defenses, although defendant quickly moved on to his preoccupation with God in responses to questions about defenses. Dr. Cavanaugh found that the religious preoccupation got in the way of defendant's responses, but that if questions were posed repeatedly in different ways, defendant usually responded. Dr. Cavanaugh acknowledged that there were some things defendant did not *want* to talk about, especially past history that involved negative material, but the witness testified that he believed defendant had the mental capacity, if not subjective willingness, to discuss the issues and to assist his attorneys in conducting his defense.

Dr. Cavanaugh believed there was not substantial evidence that defendant suffered from a current major mental illness or delusion at the time of the interview, diagnosing instead a mood disorder, most likely major depressive disorder, possibly with psychotic features, that was currently in substantial or complete remission. Defendant did not show many, if any signs of depression although he displayed the personality disorders of paranoid and narcissistic traits. Defendant was "cognitively intact" and had a good memory.

On cross-examination, Dr. Cavanaugh testified that he had performed many competency exams, and in the vast majority he has found the defendant incompetent to stand trial, mostly because of psychosis.

Dr. Cavanaugh also acknowledged he had interviewed defendant only once, in February 2004,[3] that his opinion concerned defendant's competency at that

---

[3]    It was stipulated that only one interview with defendant had been authorized for Dr. Cavanaugh. The stipulation was entered during the competency trial when a dispute emerged between the parties concerning whether the defense could ask Dr. Cavanaugh whether he had asked for any further visits. In discussing the proposed stipulation, the People argued that only one visit had been authorized and blamed the defense for requesting continuances that caused the delay between Dr. Cavanaugh's interview and the competency trial, also suggesting that Dr. Cavanaugh should see defendant that very day or over the

*(footnote continued on next page)*

time, and that he did "not have a current opinion about [defendant's] competence." Dr. Cavanaugh also acknowledged that during the interview, when defendant became less responsive he mostly turned to "high levels of abstraction about God and religion."

On redirect examination, Dr. Cavanaugh explained that in his opinion, defendant's reference to hearing God's voice was consistent with religious fervor, not hallucination. Dr. Cavanaugh considered some of defendant's responses evasive. It seemed to him that it was questions about the crime or other negative matters that caused defendant to launch into religious speeches.

A transcript of a recording of Dr. Cavanaugh's tape-recorded interview with defendant was admitted in evidence and the tape was played for the jury. It plainly demonstrated defendant's intact memory as well as his repeated express refusals to discuss the crime, his personal history, or any other matters he considered "negative." It also illustrated his settled view that the temporal trial was insignificant compared with God's judgment.

The transcript also reflects, however, that defendant understood he had counsel, and that their job was to help him. When asked how counsel would help him, he said they were representing him. He said the prosecutor was against him, and the judge was "monitoring what's going on." When asked what happens to someone who is found guilty in court, defendant said "I don't want to discuss that." He entered a not guilty plea because he had been told to, but he repeated that God was the true judge. Defendant had heard his might be a death penalty

_(footnote continued from previous page)_

weekend. Defense counsel responded that they would not permit the "disruption" of an examination in the middle of the competency trial and argued that discovery had closed.

case, but he didn't worry about it, trusting instead in God. He also trusted his attorneys, but said he wanted his attorneys just to leave things in God's hands. He didn't want to talk about what had happened, or about feeling suicidal, or about his work life, or about how people may have done bad things to him. He added, "You seem to care what happened in all my life . . . I just don't want to remember it . . . . I'm really want[ing] to forgive . . . ."

Defendant described a witness as "a person who sees something and says that this happened or that happened." He described a jury as "people up there that is trying to see how you are, the person who's being tried, and what happened and they are who decides if that person [did?] something that is completely wrong . . . ." When asked what a lawyer should do for a client who said he wasn't at the scene of the crime, he said "I'd just tell the truth," and that "obviously he would tell them he was somewhere else . . . . [t]he lawyer [would] tell the truth that he wasn't there." When asked how he, if he were the lawyer, would prove the alibi, he said, "Investigate it . . . get the real facts." When asked what a lawyer should do for a client who said he was present at the crime but it was another person who committed the crime, he said "I guess he has to prove that he was there but he didn't do it." When asked what the lawyer should do for a client who said he was at the scene, but that the victim was lying about what he did and a witness had been present, defendant said "they all have to prove, I guess, what really happened, and that's here and now." He immediately went on to state his view that "we've got nothing to prove against God . . . . He can prove a lot of stuff against us . . . [b]ut I'm willing to accept . . . whatever it is that He has for me. It doesn't matter what it is, I'm trusting him and I want to go His way . . . . That's why I'm chained up."

The prosecution also presented evidence that some months subsequent to the Cavanaugh interview, on May 30 and June 1, 2004, defendant engaged in

23

telephone conversations with his sons, with Cindi (by the time of trial no longer his wife), and with his former sister-in-law, Patricia. In the taped conversations with his sons, he opened with practical and entirely rational inquiries, including questions concerning whether the house had been painted, his sons' friends, eating habits, and daily activities, as well as directives regarding their relationships with Cindi's new boyfriend, Jesus. For example, he said: "Listen son, I just talked with that . . . that Jesus. He says that he supports you and that the phone is [in] his name, and that is why I should not be bothering no one, and all of that. I do not need to be listening to his nonsense. I told him to go and fuck his mother. Soon things are going to be fucked up for him. He does not have to go around pulling this kind of shit. Son, I told him to stay away from you guys. If you want to be with him . . . very well, I have to respect that. I am only telling you to take care, not to be with those people. I am telling you, the only thing that they are going to do is harm you. Because the only thing that they are doing . . . is for their convenience, ok my love." In conversation with Cindi, he directed her not to interfere with his relationship with his sons and to keep them away from Jesus, and he threatened her with violence if she failed to abide by his wishes in this respect.

In the phone conversation with Cindi's sister, Patricia Gonzalez, defendant debated some of the circumstances of the charged offenses, suggesting she and the rest of Cindi's family bore some responsibility for the crimes because they had failed to help him when he was distressed, or to intervene in Cindi's relationship with Camarino Chavez, a relationship defendant insisted had been conducted at his mother-in-law's home under his sons' eyes.

As noted in connection with the sanity phase evidence, when defendant told Patricia not to lie or engage in hypocrisy, Patricia said he was the only one who was lying, by saying he was crazy. Defendant said he was not crazy. Patricia said

24

his attorneys were saying that he was, but defendant responded: "That is the attorneys' and the district attorney's and of all of us's game . . . because we agreed. We are playing with that." He concluded with more complaints about not being in contact with his children, and talked about God and death as offering peace.

The prosecution also presented testimony by Dr. Trompetter, the clinical psychologist retained by the prosecution. He had observed defendant at the police station on the morning after the murders. Dr. Trompetter witnessed the police interrogation of defendant and saw no sign of psychosis or delusion. In addition, Calvin Watson, a custodial deputy for the Stanislaus County Sheriff's Department, testified he had brief conversations with defendant when passing by his cell. Watson's last contact with defendant was seven months to one year prior to the competency trial. According to Watson, defendant was able to communicate his needs, for example, asking for a cell change or responding to simple questions. Defendant had been in the jail approximately three years and had not been a problem inmate. Watson's longest conversation with defendant was about two minutes. Finally, Debbie Mandujamo, a psychiatric nurse working in the Stanislaus County Jail, testified that jail records indicated the last time defendant was seen by mental health workers at the jail was September 26, 2003, more than one year prior to the competency trial but shortly before Dr. Stewart's and Dr. Zimmerman's competency examinations. At that time defendant was not taking medications, nor had any medication been prescribed subsequently. She had no recollection of having difficulty communicating with him.

### 3. Discussion

Defendant argues that he made a "strong evidentiary showing" that he was incompetent at the time of the competency proceeding, and that his evidence was

unrefuted because the prosecution evidence was stale and otherwise unconvincing or incomplete.

Defendant presented considerable evidence of incompetency, but we disagree with his assertion that his evidence was unrefuted. We view the evidence in the light most favorable to the verdict of competency. That verdict is supported by substantial evidence that defendant was not suffering from a mental illness that deprived him of the ability to consult rationally with counsel or to understand the proceedings. Dr. Cavanaugh, a qualified expert who had performed hundreds of competency examinations, was of the opinion that defendant was competent prior to the competency hearing. The witness did not believe that defendant was then suffering from a major mental illness or personality disorder, and believed he was capable of logical and rational thought. Dr. Cavanaugh acknowledged defendant's religious preoccupation, but did not believe it proceeded from a mental defect or delusion but was an example of authentic religious fervor — a phenomenon he said was not unusual with prisoners facing trial for serious crimes. In addition, the jury could have credited the statement that defendant made to his former sister-in-law, Patricia, that the claim of his insanity was just a game he was playing with defense counsel. The comments provided potentially persuasive evidence for the jury to conclude defendant was, at least to some degree, feigning mental illness.

Defendant contends there was absolutely no evidence that he was able to assist counsel in the defense. We do not agree. Dr. Cavanaugh drew defendant into a discussion of hypothetical defenses and defendant was able rationally to respond to questions concerning what defenses should be mounted by defense counsel under the various hypotheticals presented. In addition to this evidence of his ability to understand how an accused would work with counsel to develop a defense, there was supporting opinion evidence from Dr. Cavanaugh that defendant's reluctance to discuss the facts of his own case or even his personal

26

history — a serious impediment to the defense, without doubt — arose from an *unwillingness* to engage, rather than an inability to do so based upon mental disease or defect.

As Dr. Cavanaugh commented, and our review of the record confirms, defendant made statements indicating that he did not wish to discuss the painful facts of the crime or of his own past — but the evidence supports Dr. Cavanaugh's opinion that defendant was *unwilling* rather than *unable* to discuss them. Voluntary barriers to communication with counsel on the part of a defendant who was able to cooperate do not demonstrate incompetence. (See *Marks*, *supra,* 31 Cal.4th at p. 207.)

Defendant's own responses during the interview with Dr. Cavanaugh further support the conclusion that defendant understood the nature of the proceedings. They indicated an understanding of the function of the judge, the jury, the prosecutor, and the defense attorneys, as well as defendant's understanding of what would be involved in developing various defenses along with his attorneys and that he had been charged with a capital crime. Moreover, even in the interview with defense expert Dr. Schaeffer shortly before the competency trial, defendant gave answers that revealed some basic understanding of the charges, of plea bargaining, and of the function of the trial and its major participants. He indicated that his counsel were on his side in the courtroom, that a witness would be there to speak under an obligation to tell the truth, and expressed the belief that the prosecutor, the judge and the jury were against him. Defendant stated furthermore that he wanted to convince the jury of his innocence.

Defendant argues that no weight should be given to Dr. Cavanaugh's opinion that defendant was able to cooperate with counsel in developing and presenting the defense because the opinion was contradicted by defendant's answers during the interview, answers that emphasized the dominant role of God

27

in determining his guilt or innocence and defendant's confusion about the process. We are not persuaded. Rather, we draw reasonable inferences in favor of the verdict. The jury reasonably could credit Dr. Cavanaugh's explanation that defendant's religious preoccupation was not a product of mental illness but of sincere religious enthusiasm, and the expert's explanation that defendant was not unable but rather was choosing to avoid discussion of the crimes, his personal history, and any other negative material.

Defendant challenges the evidentiary value of Dr. Cavanaugh's testimony, claiming "lack of preparation, inadequate foundation, and consequent lapses in reasoning." Defendant's complaints that the asserted failure to conduct a "proper" competency evaluation goes solely to the weight the trier of fact would afford the witness's testimony. Dr. Cavanaugh was qualified and experienced in performing competency examinations, as the defense did not deny at the trial. He had reviewed the reports of Drs. Schaeffer, Stuart, and Zimmerman, photographs, jail mental health records, a videotape of defendant following his arrest, a transcript of defendant's police interrogation, recordings of recent phone conversations, and copies of crime reports, as well as mental health records provided by the defense.

Nor does defendant demonstrate that the witness — who had qualified many times as a competency expert — failed to meet generally accepted minimum standards for a competency interview. (See *People v. Stanley* (1995) 10 Cal.4th 764, 811-812.) Dr. Cavanaugh explained his professional opinion that the standardized competency examination used in 2003 by Dr. Stewart gave many unreliable results indicating incompetency on the part of persons he believed to be actually competent. He also pointed to evidence that defendant's cognitive functioning, including memory, ability to make abstract determinations and engage in higher level thinking, was quite intact. Dr. Cavanaugh believed that

28

defendant's ability to discuss his own personal history also indicated his ability to assist counsel.

Defendant argues that the evidence provided by Dr. Cavanaugh was stale and therefore of little or no probative value on the question presented to the jury, namely, defendant's competence as of the time of the competency proceeding. He points out that Dr. Cavanaugh's interview occurred 10 months before the competency hearing and did not purport to render an opinion concerning his competency at the time of the hearing.

The lapse of time between Dr. Cavanaugh's interview and the competency trial does diminish the probative value of the expert's opinion and testimony to some extent, since the issue before the jury was defendant's current competency. Yet the jury reasonably could draw inferences concerning defendant's competency *at the time of the competency trial* from Dr. Cavanaugh's observations and from the statements defendant made to him, as well as from the defense evidence itself.

First, the statements defendant made to Dr. Cavanaugh concerning defense counsel and his own understanding of the proceedings bore marked similarities to his statements during the interview with the defense expert, Dr. Schaeffer, just prior to the competency hearing, supporting the inference that his condition was similar at both times, and that on each occasion he had sufficient ability to rationally consult with his lawyers and understand the proceedings. In the Schaeffer interview, defendant said he wanted his lawyers to argue at the trial that he was innocent, that he "didn't want to harm anybody," and that he "didn't understand that [he] was hurting the people that [he] most loved," including his wife's family. He knew the names of his lawyers and said, at one point, that they were on his side in the courtroom. He certainly resisted the idea that a secular trial had any legitimacy, in contrast to a trial by God — just as he had with Dr. Cavanaugh — but Dr. Schaeffer was able to focus his attention on the

potential that he might testify, and defendant gave somewhat coherent answers concerning whether he was carrying money on the night of the crimes and whether he transported an injured girl to the hospital "[t]o help her so she could be okay." He exhibited some understanding of the possibility of a plea bargain, and seemed to understand the difference between a short and long term in prison. He told Dr. Schaeffer that he "guessed" he knew what he was doing the day of the crimes, adding that he had gone to his mother-in-law's house that day. Defendant specifically informed Dr. Schaeffer that he believed he could tell his lawyers what had happened on the day of the crimes.

Moreover, the features of defendant's responses that caused Dr. Stewart to believe in 2003 and throughout 2004, and Dr. Schaeffer to believe in December 2004, that defendant was *incompetent* also appeared in Dr. Cavanaugh's February 2004 interview. Dr. Cavanaugh simply drew a different conclusion from what ultimately was relatively consistent evidence. Specifically, the defense experts interpreted defendant's religious preoccupation and his rambling away from any discussion of the facts of the crime and his own biography as indicators of defendant's disease-based inability to work with counsel in any rational manner. Dr. Cavanaugh, by contrast, saw similar manifestations of religious preoccupation but did not believe they were a feature of a mental disease. He viewed defendant's reluctance to answer specific questions and his rambling when pressed on the facts of the crime or his own mental condition as demonstrating an *unwillingness* but not *incapacity* to answer painful questions. Defendant's remarks to the expert certainly could be interpreted to support such an inference, and the jury reasonably could have adopted Dr. Cavanaugh's view. And as the Attorney General also points out, the jury was not required to accept the conclusion of the defense experts. (*Marshall*, *supra*, 15 Cal.4th at p. 31.)

We also observe that the defense itself relied in substantial part upon evidence from as early as November 2003, several months before the Cavanaugh interview, including testimony by Dr. Stewart concerning results of a standardized test the defense faulted Dr. Cavanaugh for failing to administer. As defendant must acknowledge based on his *own* reliance on evidence long predating the competency trial, evidence that predates that hearing may legitimately provide substantial evidence on the competency issue before the fact finders.

Finally, the fact finders had additional evidence supporting Dr. Cavanaugh's conclusion in the form of the jailhouse phone calls that occurred some months after the Cavanaugh interview. From these the jury reasonably could draw the inference that defendant's condition was not growing worse over the months just preceding the competency trial as the defense argued, but that he retained the ability, when he wished, to engage in rational discussions regarding daily life and various personal matters with his sons and with Cindi Martinez, and concerning the crime and the defense with his former sister-in-law, Patricia Gonzales. This evidence also tended to support Dr. Cavanaugh's view that defendant's reluctance to engage with the trial proceedings or discuss the facts of the crime were matters of choice, not an incapacity caused by mental illness. There was also evidence, through defendant's statements to Patricia about his "craziness" being a "game," that defendant was to some extent feigning mental illness. The jury had additional evidence from other witnesses that defendant's mental condition did not worsen sufficiently to require administration of psychotropic medication.

Defendant also argues that testimony from jail staff and Dr. Trompetter, was not probative of his competency at the time of the competency proceedings. We tend to agree that Dr. Trompetter's testimony concerning the jailhouse interview was less probative given its remoteness in time. The jail staff evidence,

31

on the other hand, supplied some corroboration for Dr. Cavanaugh's view that at the time he interviewed defendant, defendant was not suffering from a major psychiatric problem and that at least during 2003 and the first half of 2004 — at a time Dr. Stewart and Dr. Schaeffer firmly believed defendant already was incompetent — defendant was able to function normally in the jail and was not receiving medication for mental disease.

Under the circumstances, we cannot accept defendant's argument that his case is comparable to the *Samuel* case. (*Samuel*, *supra*, 29 Cal.3d 489.) In that matter, the defense evidence of incompetence was overwhelming; moreover, it was essentially uncontradicted by any prosecution evidence. "Five court-appointed psychiatrists, three psychologists, a medical doctor, a nurse, and three psychiatric technicians testified to Samuel's incompetency, and four psychiatric reports were admitted into evidence. [Citation.] Each witness and every report concluded Samuel was incompetent to stand trial. [Citation.] In response, the prosecution offered no expert testimony and only two lay witnesses, neither of whom contradicted any of the defense testimony. . . . Prosecution witnesses merely testified regarding Samuel's escape from Patton State Hospital and his ability to perform routine manual tasks." (*People v. Stanley*, *supra*, 10 Cal.4th at pp. 808-809.) On that record, we found that no reasonable trier of fact could reject the defense evidence of incompetency. (*Id*. at p. 809; *Samuel*, *supra*, at p. 506.)

In the present case, by contrast, the prosecution *did* present evidence of solid value indicating competence. The record therefore is "not comparable to the virtually one-sided showing of incompetence in *Samuel*." (*People v. Stanley*, *supra*, 10 Cal.4th at p. 809; accord, *Marks*, *supra*, 31 Cal.4th at pp. 219-220.)

We must emphasize that it is not our function to substitute our judgment for that of the jury or to reweigh the evidence. Rather, we are required to "view the record in the light most favorable to the verdict." (*Marshall*, *supra*, 15 Cal.4th at

32

p. 31; *Frye*, *supra*, 18 Cal.4th at p. 1004.) Drawing all reasonable inferences in favor of the verdict in the present case, we decline to disturb it. This is certainly not a case like *Samuel* in which no reasonable trier of fact could reject the defense evidence. (*Samuel*, *supra*, 29 Cal.3d at p. 506; cf. *In re R.V.* (2015) 61 Cal.4th 181, 201.)

Next, defendant contends the trial court applied a standard that was inconsistent with the federal constitutional standard for measuring competency when it denied defendant's motion under Code of Civil Procedure section 629 for judgment notwithstanding the verdict.

In denying defendant's motion for judgment notwithstanding the verdict, the trial court commented that it had heard all the evidence and believed "that there was evidence from Dr. Cavanaugh's opinion which was supported by evidence from the phone calls and other evidence indicating that the defendant had capacity to carry on rational discussions, did not appear to be so depressed that he was unable to rationally think or rationally pursue objectives which he believed were appropriate to himself and to his situation. [¶] So under the circumstances the Court finds that there was substantial evidence to support the jury's verdict."

Defendant argues that a verdict of competency requires more than ability to carry on a rational discussion and pursue objectives rationally. He maintains that the trial court failed to consider whether "defendant had present ability to make essential decisions critical to a fair trial, including whether to plead guilty or go to trial, to take or waive the right to testify and to call or cross-examine witnesses, and to assist counsel in whether (and how) to put on the defense and whether to raise one or more affirmative defenses."

A trial court may grant a motion for judgment notwithstanding the verdict only if there is not substantial evidence to support the verdict. (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) A court reviewing an

33

order resolving such a motion applies essentially the same standard (*ibid*.) and "must uphold the trial court's denial of the motion unless there is no substantial evidence to support the verdict" (*Kephart v. Genuity, Inc.* (2006) 136 Cal.App.4th 280, 289; see 5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 832, 1260 [rules applicable to civil proceedings, including judgment notwithstanding the verdict, apply to competency hearings during a criminal trial]).  Applying the correct standard for competency, we have concluded that substantial evidence supported the jury's competency verdict.  Accordingly we need not closely review the completeness of the trial court's comments; the trial court did not err in denying the motion for judgment notwithstanding the verdict.

Finally, defendant contends that international jurisprudence "fully supports" his claim that there was insufficient evidence of his mental competency to support the verdict.  He notes the relative simplicity of the federal constitutional standard, and urges that foreign jurisdictions have offered more detailed guidance that could be instructive on this point.  He does not challenge the existing federal constitutional standard as inconsistent with current principles defining due process of law, however.  Indeed he acknowledges that the international jurisprudence he cites is "broadly consistent" with the *Drope* standard.  (See *Drope v. Missouri* (1975) 420 U.S. 162 (*Drope*).)  We are satisfied that under state and federal standards, the jury's verdict finding defendant competent to stand trial was supported by substantial evidence.  To the extent defendant's reliance upon international standards is framed as a challenge to the trial court's statement of reasons for denying the motion for judgment notwithstanding the verdict, we have already explained that we need not review the trial court's statements of reasons because on review of an order denying a motion for a verdict notwithstanding the judgment, this court must itself determine whether the verdict is supported by substantial evidence.

34

**B. Failure to conduct additional competency hearings**

Defendant contends that the trial court's failure to conduct additional competency hearings at various points during the proceedings constituted a violation of his federal constitutional right to due process of law as well as an abuse of discretion, requiring reversal of his convictions.

As defendant acknowledges, "[w]hen a competency hearing has already been held and the defendant has been found competent to stand trial . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding." (*People v. Jones* (1991) 53 Cal.3d 1115, 1153 (*Jones*); accord, *People v. Leonard* (2007) 40 Cal.4th 1370, 1415 (*Leonard*); *Marshall*, *supra*, 15 Cal.4th at p. 33.)

"When defense counsel has presented substantial evidence [that is, evidence from which a reasonable jurist would entertain a bona fide doubt concerning competency] that a defendant is incompetent to stand trial, the trial court must declare a doubt as to the defendant's competence and suspend proceedings even if the court's own observations lead it to believe the defendant is competent. [Citation.] But when . . . a competency hearing has already been held, the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state." (*Jones*, *supra*, 53 Cal.3d at p. 1153; accord, *Marshall*, *supra*, 15 Cal.4th at p. 33 [confirming deference generally afforded to trial court's view of the defendant's condition].)

At the same time, of course, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." (*Drope*, *supra*, 420 U.S. at p. 181.)

Defendant rests his claim principally upon his emotional response to Cindi Martinez's testimony during the guilt phase of trial; a report from Dr. Wendy Weiss prepared just prior to and proffered during the sanity phase of the trial; defense counsel's expressed doubts regarding his competency on various occasions; and defendant's own statements and outbursts.

It is not entirely clear at what point or points defendant believes that he presented a substantial change of condition or new evidence casting doubt on the competency determination such that the trial court was obliged to suspend the proceedings and conduct another competency trial. We infer that defendant believes that threshold was crossed for the first time on October 14, 2005, near the commencement of the guilt trial; was crossed again no later than when he responded emotionally to his by then former wife's testimony during the guilt phase; and that it was crossed repeatedly again as evidence of his assertedly increasing incompetence accumulated during the sanity phase, the penalty phase, and at sentencing.

We begin with events of October 14, 2005, approximately 10 months after the competency trial. The court asked whether defendant would waive his presence during discussion of the juror questionnaires, but both defense counsel responded that defendant was not competent to waive his rights or for that matter, to stand trial. Counsel asserted that defendant had a major mental illness that was in an active stage, commenting that whereas the focus at the competency trial had been whether defendant would be able to assist counsel, now the question was whether he could "get through" the trial. Counsel asserted that defendant was unable to understand his rights including the right to testify, and that he was unable to testify competently. Counsel remarked that defendant had shown symptoms of major mental illness since 2002, but that in the months since the competency verdict in December 2004, defendant had further deteriorated.

36

Counsel explained that defendant concentrated on his children, his family, the guilt of others and the hypocrisy of the "system," making it difficult to work with him and impossible for him to testify. In addition, counsel complained that defendant did not follow directions from his attorneys, and that, as also emerged during the competency trial, defendant's conversations with family members were — because of mental illness — almost always inappropriate and now were causing family members not to testify on his behalf. Counsel also noted that when several months before trial he brought a priest to visit defendant, defendant insisted that the priest confess to him. In the week preceding counsel's remarks, counsel added, defendant expressed a desire to remain shackled and not dressed in street clothes for trial, and that he expressed a preference for the death penalty. In sum, he said: "It's not like this guy is suddenly schizophrenic or suddenly has a different mental illness, but it's worse."

The trial court responded that the matters mentioned by counsel, including the defendant's behavior, were not substantially different from concerns counsel had expressed earlier and that no change of circumstances had been shown.

On November 1, 2005, during jury selection, one of defendant's two attorneys again stated the belief that defendant was not competent. Counsel asserted that during jury selection defendant had been "completely uninvolved" in the case and would not respond when counsel solicited his feedback regarding each of the panels of prospective jurors. Counsel stated: "I believe, based upon consultation with experts and my long history with [defendant] that this is because of mental disease, defect, or disorder, and he remains incompetent to stand trial in this matter." The court again found no change in status.

On November 3, 2005, the prosecution was examining Cindi Martinez and proffered a tape recording of her 911 call to the police shortly after the murders. Defense counsel asked that the tape be played at a later date and in Ms. Martinez's

37

absence. He said: "Foundationally, I just am quite concerned about the disability of my client at this time as we've put on the record time and again." The court stated its concern that the tape would be upsetting for the witness, but she indicated her desire to remain in the courtroom while the tape was played. Defense counsel then asked, "May my client be excused for this? He's heard it once." The trial court responded, "Mr. Mendoza, do you waive your presence for the playing of this tape?" Defendant responded: "Yeah." The court informed the jury: "For the record, ladies and gentlemen, Mr. Mendoza has indicated that he wishes to be excused from the courtroom during the playing of this tape.

After the tape was played, the court asked whether defendant would return to the courtroom. In response, defense counsel asked for an in camera hearing because of "something that's gone on back there." Counsel explained that "there's been some communication between our client and [defense counsel] that I think needs to be addressed in camera about his presence in the courtroom and other things that happened in the back here that I don't feel comfortable putting on in a public forum and/or with the prosecution present." Counsel stated "we'll waive Mr. Mendoza's presence during that [in camera hearing]." At the hearing, one of the defense attorneys stated that he had spent five or 10 minutes with defendant outside the courtroom while the tape was being played, and "he's probably right on the edge of just complete melt-down mentally. He expressed a strong desire to not be in the courtroom anymore. I'm not sure what would happen if he is, obviously. But he's certainly decompensated to a point that I haven't seen him before. He's certainly not going to help himself in any way."

The court responded that it had observed defendant when he returned to court and "he looked alert and okay." The court added that "it may be his wife that is triggering all of this and . . . if he's absent from her testimony . . . then

38

maybe he can return to the courtroom thereafter and . . . be able to handle the relatively dry . . . kinds of things that are coming after that."

Defense counsel responded that forthcoming testimony would include that of Dr. Rulon, the forensic pathologist who performed the autopsies, and suggested that the autopsy pictures would be very upsetting for defendant. The court agreed, but said: "I guess we'll have to cross that bridge when we come to it. That would be my suggestion. Otherwise, we can just try to have him come back in and just hear it. But apparently, that's not his desire. So maybe that, as a compromise solution, for the time being might work."

Counsel responded: "Then we can reassess it." Counsel asked the court to recall that it had been difficult for defendant when his former wife testified at the preliminary hearing two and a half years before. He added that defendant had been sobbing "very heavily" during the testimony of the doctor just prior to her testimony. "He sobbed quite a bit during the trial, but this was much heavier than he has in the past. And he doesn't look like he's been sleeping. He looks terrible." The court responded that they would try proceeding in defendant's absence and "see where we go from there."

At this point Deputy District Attorney Annette Rees appeared in chambers (though defendant remained absent), and the court explained that counsel had said that defendant "is not doing very well. And in order to stave off more — other consequences, I suggested that perhaps he could remain out of the courtroom while Cindi finishes testifying. And they seemed to think that then we can reassess where he is after that." Rees responded that she had no objection if defendant waived his right to be present, but asked what "not doing well" signified, and whether defendant was physically ill. The court responded: "Well, emotionally." The jury returned to the court room and the court stated that defendant "has elected to continue his absence from the courtroom for the duration

39

of the testimony of at least this next witness. You're not to consider that for any purpose or hold it against him."

Defendant was absent during the remaining testimony by Cindi Martinez and during the testimony of James Hamiel, the criminalist. The following day, a Friday, defense counsel Spierling put on the record that on Tuesday and Wednesday mornings of the same week, defendant "cried almost the entire time, had his hand over his face a good part of the time. [¶] And Thursday it was pretty well recorded . . . his attitude and demeanor sitting there quietly crying. That continued this morning. [¶] I think that was a result of his mental disease or defect and it affects our ability to adequately represent him and for his adequate participation in the trial."

Such statements by counsel and conduct by defendant are, of course, relevant to the issue of defendant's competency. (*Medina v. California*, *supra*, 505 U.S. at p. 450 ["defense counsel will often have the best-informed view of the defendant's ability to participate in his defense"]; *Drope*, *supra*, 420 U.S. at pp. 176-177 ["judges must depend to some extent on counsel to bring issues into focus"]; *Pate v. Robinson* (1966) 383 U.S. 375, 385 [relevance of the defendant's irrational behavior]; *People v. Lewis* (2008) 43 Cal.4th 415, 525 [counsel's declarations entitled to some weight, though not determinative], disapproved on another point in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) Although at one point defense counsel referred to "consultation with experts," however, he offered no new expert reports. Instead, counsel asserted that to his own knowledge defendant's mental condition had deteriorated in the approximately 10 to 11 months since the competency hearing, and he provided some examples. The examples, however — the focus on his children and the guilt of others, the inappropriate contact with family members, the bizarre interactions with the priest — sounded very much like the evidence the defense proffered during the

40

competency trial. We recall, for example, that when Dr. Stewart first interviewed defendant in 2003, defendant asked whether he was there to administer the lethal injection, a question Dr. Stewart considered bizarre under the circumstances. And much of the evidence of the competency trial reflected similar preoccupation with his children, the guilt of others, and inappropriate — even threatening — phone contacts with family members. Defendant's perceived lack of involvement during jury selection is notable, but is quite consistent with the evidence from the competency trial indicating that he was not interested in the temporal proceedings, but only in God's justice. There was little or no *new* evidence indicating that, contrary to Dr. Cavanaugh's view that defendant's aversion to focusing on the temporal trial was a matter of choice, it was actually a matter of mental illness.

More troubling, perhaps, are defendant's own statements and actions. All the competency experts agreed that defendant had suffered or was continuing to suffer from major depression. It could be inferred from defendant's expressed preference for the death penalty and to remain shackled that the depression Dr. Cavanaugh believed was in remission in February 2004 had resumed an active phase. The same inference could be drawn from defendant's steady weeping during several days of testimony, and his more emphatic emotions during his former wife's testimony — emotions that rendered him unable to remain in the courtroom during important testimony. Defense counsel also recorded an observation that it appeared defendant had not been sleeping.

On the other hand, as defense counsel himself acknowledged, defendant had suffered similar emotional difficulty with Cindi's testimony during the preliminary examination years before, although it does not appear he was unable to remain in the courtroom. Defendant had displayed wide mood fluctuations and had wept at points during his interviews with Dr. Stewart in 2003. Indeed he was weeping and very emotional during his encounters with the school principal and

41

the deputy sheriff assigned to the school — both at school and at his home — the day before the crimes. He also was reported to be rambling, random, paranoid, and unfocused in his remarks during those interchanges. And during the interviews conducted by the various experts in the months and years before trial, he had displayed a lack of interest in his fate at the hands of the jury. The trial court had observed defendant's behavior for years, including at the preliminary hearing and the competency trial. The court was aware that during the early stages of the proceedings, defendant had been prescribed Prozac and that after an interval he took Remerol instead, but that he had stopped taking them more than a year prior to the competency trial because he apparently was feeling better. There was no evidence that psychiatric medication was prescribed subsequently. Under the circumstances, we do not believe that the record includes substantial evidence of a *change* of condition or *new* evidence casting doubt on the competency verdict that would *require* the court to order a second competency hearing.

Contrary to defendant's assertion, this is not a case like *Maxwell v. Roe* (9th Cir. 2010) 606 F.3d 561, in which the federal appellate court reversed a conviction on the ground that the state trial court erroneously declined to conduct a second competency hearing. In that case, not only had counsel complained that the defendant was incompetent, his outbursts were so violent he had to be put in restraints. In addition, there was a midtrial suicide attempt and 72-hour and 14-day involuntary psychiatric holds instituted under Welfare and Institutions Code sections 5150 and 5250. Under those circumstances, it was error not to hold another competency hearing. The federal court acknowledged that the prior finding was relevant, but stated that "there was *substantial evidence that Maxwell's mental condition had significantly deteriorated* since the initial pretrial . . . competency determination. . . . After [13 months] had passed the trial court would have been unreasonable in relying solely on a stale competency

42

determination in the face of contradictory evidence" — citing authority stating that "once there is *substantial new evidence of incompetency,* a bona fide doubt is raised that 'cannot be dispelled by resort to [pre-existing] conflicting evidence.' " (*Id*. at p. 575.)  The court went on to observe that "[t]here was *overwhelming* evidence that regardless of the prior competency determination, Maxwell was incompetent at the time of his . . . murder trial." (*Ibid*.)

We do not see the same substantial new evidence, much less overwhelming evidence of incompetency in the present case.  Defendant's conduct was muted and his absence during testimony was much shorter than in the *Maxwell* case, nor was it accompanied by evidence of a psychiatric crisis requiring involuntary commitment.  We note, too, that unlike in the present case, in *Maxwell* the trial court was not the same court that had conducted the pretrial competency hearing, and accordingly did not have the same lengthy personal knowledge of the case.  By contrast in defendant's case, the trial court was in a position to determine from its own observations ever since the preliminary examination, including presiding over the competency proceedings, that the proffered new evidence of defendant's incompetence during trial, including his weeping, irrationality, and the reported lack of engagement in his own defense, were not indicators of a change but were consistent with behaviors and the evidence of incompetence that had been considered at the competency trial.

Next we examine events occurring during closing argument in the guilt phase, before and after the sanity phase, during closing argument in the penalty phase, and in connection with the defense motion for new trial.  Relying on these events, defendant contends they include new expert opinion evidence that should, along with defendant's demeanor and conduct and the comments of counsel, have indicated a change of circumstances or new evidence throwing doubt on the competency verdict.

43

On November 9, 2005, when Deputy District Attorney Douglas Raynaud mentioned in closing argument in the guilt phase that defendant had promised Guadalupe that he would not hurt her mother, defendant exclaimed: "It's a lie." When Raynaud took up the issue of malice aforethought, defendant exclaimed: "I didn't plan to kill my family."

The same day, defense counsel stated to the court that "once again . . . [defendant] remains incompetent to stand trial. His demeanor and activities and actions during the course of the trial over the past several days continue to be consistent with a person who is unable to assist counsel in presenting a defense or to relevantly participate in the proceedings." He added that defendant had been "consistently sobbing and crying throughout the proceedings." Deputy district attorney Rees stated that she had observed defendant conversing with counsel in a way that seemed "somewhat articulate." The court announced that it had "observed [defendant's] behavior, [and] does not find it different in kind from the behavior he has previously exhibited during the course of this case."

On November 29, 2005, at the conclusion of the sanity trial, the government of Mexico filed an amicus brief asking the court to reconsider the issue of competency. In addition to circumstances already related above, including the various comments of defense counsel, the amicus curiae brief relied upon a report by Dr. Wendy Weiss, a clinical and forensic psychologist appointed by the court for the sanity phase. Defendant also places primary reliance upon her testimony.

Although Dr. Weiss was of the opinion that defendant was sane at the time of the crime under the applicable legal standard, she also had testified that in her interview with defendant in July 2005, several months prior to the trial, he appeared to be "very depressed and disorganized in his thinking and my diagnostic impression was major depressive disorder with psychotic features." She based her

44

opinion regarding his sanity at the time of the crime not only on her 2005 interview but also on previously assembled family history, records of his behavior during the crime and when he was interrogated upon arrest, interview reports from Dr. Schaeffer and Dr. Stewart, and mental health records from the jail.

The trial court declined to reopen the competency issue in light of the amicus curiae brief from the government of Mexico.

We acknowledge that Dr. Weiss testified that "[i]f anything, I think when I saw [defendant] he appeared to have deteriorated from the time . . . that the records were assembled." She believed that his mental state was similar at the time of the crime to what it was at the time of her interview, although it was more "severe" in 2005.

On the other hand, Dr. Weiss's focus and task was to offer her opinion on defendant's state of mind at the time of the crimes — not his current competency. In addition, Dr. Weiss stated that defendant's demeanor during the 2005 interview was *consistent* with the other evidence noted above, and that in the interview he was "tearful and again somewhat disorganized and appeared depressed and reported feeling depressed." Her observations concerning defendant's symptoms were very similar to the observations reported by defense experts even prior to the competency hearing, and indeed, to defendant's interactions with school representatives on the day before the crimes. She observed that school officials had trouble getting defendant to "focus on the issue at hand" and that at that time he was preoccupied with paranoid thoughts and suffered from disorganized thinking. Indeed Dr. Weiss observed consistent paranoid features in defendant's mental illness, such as that both during her interview with him in 2005 and in December 2001 he expressed similar beliefs about the evils of the government and that people were trying to hurt his children. In her interview with him, as well as in earlier interviews, it seemed to her that he had a delusional belief that what he

45

had done was justified. Dr. Weiss commented that during his jailhouse interview at the time of his arrest, as well as in her interview with him, there was "an element of not wanting to answer the questions that were being asked, that he didn't want to talk about the subject matter" — including about the facts of the crimes. She said she believed that "it was a very emotionally upsetting topic for him and he didn't want to answer questions because it was upsetting to him." The overall import of the testimony, to the extent it was relevant to the issue of competency at all, was to confirm the consistency of the condition defendant exhibited in 2005, near the time of trial, with his earlier condition, even predating the competency trial. Dr. Weiss's testimony therefore did not suggest a change in status between the time of the competency hearing and July 2005, nor, being so similar to evidence before the jury in the competency hearing, did it constitute evidence tending to undermine the jury's verdict. (See *People v. Lawley* (2002) 27 Cal.4th 102, 136 [proffered evidence did not demonstrate any change but rather "manifest[ed] the same arguably delusional beliefs reported" by the competency evaluators].)

Turning to other evidence assertedly requiring a new competency hearing, defendant points out that during the penalty phase closing argument, when the People attempted to refute the claim that defendant had believed he was helping his children, defendant exclaimed with a curse, "leave my kids alone." The court directed defendant to remain silent or he would be removed, and defendant responded: "Do whatever you want, but not my kids, okay. This is not — this is wrong. They're talking about [my] killing somebody, and they want to kill me." After a recess, defendant apologized to the court and jury for his outburst. The next day, defense counsel raised the issue of competence again: "I wanted once again — as we have throughout this trial since October — [to] raise the issue of the defendant's competence. I still don't think he's competent. I don't think he's

46

been competent throughout the penalty phase.  I think that was borne out by his statements yesterday. . . .  [¶]  I just don't think he was *ever* able to assist counsel in a meaningful way and make a decision about testifying."  (Italics added.)  The court responded:  "I don't think there's been a change of circumstance.  I think [defendant's] competence level has been the same throughout."

Defendant renewed the competency issue by way of motion for new trial.  Counsel declared that "*at all times*" during each phase of trial, counsel were convinced that defendant was not competent to assist them.  (Italics added.)  Counsel's declaration stated that defendant had wanted to testify but in counsel's view, because of his "ongoing mental problems" he was unable to convey any rational information concerning his proposed testimony.  The declaration recounted that at some unspecified date counsel consulted Dr. Stewart, whose view was that defendant's mental illness prevented counsel from advising him regarding testifying, and at no time did counsel inform defendant that he had the right to testify.  Counsel argued that the defense had presented "overwhelming" evidence of incompetence at the competency trial, also urging  that because the jurors in the competency phase of the trial returned its verdict in 15 minutes, it was evident they had not given any consideration to the evidence.  At the hearing, counsel added that there was no case law outlining what change of circumstances should be considered and the change of circumstance standard was "an impossible burden."

The trial court denied the motion, stating that it had observed defendant and his conduct "throughout the case from the beginning to end, and it was the Court's observation that it was basically the same.  [I]t was my observation that he was more disturbed during the course of the trial proceedings than he had been in some of the earlier hearings.  But that was in the Court's opinion understandable in view of the type of testimony that was presented and the type of events that were

occurring during the course of the trial." The court also referred to tape recordings of defendant's phone conversations from jail, including some made after the guilt phase verdict, adding that these did not "reflect the degree of depression or moroseness that [defendant] displayed during courtroom proceedings where he frequently and most often sat with his head down not observing the trial, the proceedings as the record will reflect he is doing now. [¶] It was . . . and is the Court's opinion that there were no changed circumstances between the time of trial or during the trial proceedings."

Contrary to defendant's claim, his outbursts during the prosecutor's argument did not indicate a change of condition or new evidence requiring a further competency hearing. The trial court explained that his conduct appeared to be a response to the difficult emotional content of the trial, not a product of depression.

Defendant emphasizes his trial counsel's repeated assertions to the trial court that, because of defendant's mental illness, he was unable to assist them in the defense. Certainly trial courts should consider and often rely on counsel's statements regarding competency, but in this case counsel themselves insisted that defendant *always* had been incompetent, that the competency jury simply had erred in rejecting what they were convinced was an overwhelming case, and that the law requiring a change of condition or new evidence was an "impossible burden" for the defense. From the first time they raised the issue, they asserted they were unable to secure defendant's meaningful assistance and their complaints throughout the trial echoed the observations from the experts concerning defendant's inability to focus, his religious preoccupation, and his lack of interest in his legal predicament. (See *People v. Medina* (1995) 11 Cal.4th 694, 734 [unwillingness to cooperate with counsel predated the initial competency determination; its continuation was not a change requiring a new hearing].) Under

48

the circumstances, we see no reason to rely on counsel's comments to disturb the trial court's view that defendant's conduct and demeanor had been basically the same throughout the trial, and that his tears and emotional upset as the case progressed were caused by the challenging testimony and argument he heard as he sat in the court room.

Nor do we agree that the passage of time between the competency trial and counsel's various requests that the court institute a second competency proceeding required the court to conduct another hearing. The passage of time may be relevant, but in light of the court's lengthy experience observing defendant at every stage of the proceedings, we do not find it determinative.

Defendant asserts that the court itself apparently for a time believed defendant was incompetent, pointing to a colloquy that occurred in early 2005 (shortly after the competency verdict) when defendant moved to represent himself. In response to the court's inquiry regarding self-representation, defendant suggested that the trial involved protection of his children, and said that if he represented himself he would call on God's assistance. His comments were consistent with views he espoused during the competency interviews. Although the basis for the trial court's ruling later changed to one based upon untimeliness, originally the court denied the motion because it believed defendant was incompetent to represent himself even though he was not incompetent to stand trial. The court believed that it could apply a different and higher standard of competence to the self-representation motion than would apply to competence to stand trial — a point of view subsequently confirmed by the United States Supreme Court's decision in *Indiana v. Edwards* (2008) 554 U.S. 164, 174-178. (See *People v. Johnson* (2012) 53 Cal.4th 519, 527-530.) Because the court was applying a higher standard, the trial court's reaction to defendant's comments is of no assistance in the context of the present claim on appeal.

49

Nor do we believe that defendant's rambling, religion-infused comments at the sentencing hearing required a new competency hearing, contrary to trial counsel's renewed claim. Defendant had been rambling in his speech even the day before the crime, and this continued throughout the competency evaluations; he expressed similar religious preoccupations during those evaluations. (See *People v. Blacksher* (2011) 52 Cal.4th 769, 851 [the defendant's rambling remarks were nothing new; an additional competency hearing not required]; *People v. Lawley*, *supra*, 27 Cal.4th at pp. 136-137 [the defendant's repetition of delusional beliefs did not require a new competency hearing].)

Finally, defendant's reference to international jurisprudence is of no assistance, but we reject the claim for the reasons stated above. Defendant largely asserts that the international jurisprudence agrees with existing American constitutional standards. To the extent he claims the international jurisprudence embody a higher standard, he fails to demonstrate why such a higher standard is required under the federal Constitution or state law.

### C. Defendant's absence from the trial

Defendant contends the trial court violated his state and federal constitutional right to confrontation of witnesses and to due process of law, as well as his rights under state statutes, when it permitted evidentiary portions of the trial to proceed in his absence. Defendant refers to his absence from the courtroom during the playing of a recording of Cindi Martinez's 911 call to police on the night of the murders, as well as the portion of her testimony that followed that evidence. He also bases his claim on his absence during the testimony of the next witness, Jaime Hamiel, a criminalist who testified as an expert concerning firearms. He also refers to additional absences to support his claim he did not validly waive his right to be present during the two witness's testimony, arguing

50

that the other excusals were "repeated, cursory, and almost automatic" and also indicated the court and all counsel believed him to be incompetent.

### 1. Factual background

Cindi Martinez's recorded 911 call to police on the night of the murders was played for the jury during the prosecutor's opening statement. She subsequently testified for the prosecution. In defendant's presence, and with defendant evidently exhibiting some distress, Cindi testified that she had gotten a telephone call from defendant in the early morning hours after the murders. She recounted that during the call, he said he had killed her entire family. She testified that she called her family home, that no one answered, and that she then called 911. Without objection, the prosecution introduced a transcript of the tape recording, and then sought to play the recording for the jury. As recounted above, defense counsel requested that defendant be permitted to leave the court room during the playing of the recording, pointing out that defendant had already heard it, and commenting on how upsetting it was for him. The court asked defendant whether he waived his presence for the playing of the recording, and defendant answered in the affirmative. During the call, Cindi identified herself, said that her husband had called to say he had killed her mother and that she, Cindi, wanted to go to her mother's home but she still had her three sons with her. She said defendant had called to find out whether she was at home. She wept and said she should not stay at the apartment. She agreed that the Ceres police could come to check on her. She said that defendant said "I warned you." In the recording, Cindi remarked that defendant had never been in trouble with the law.

When Cindi's testimony continued in defendant's absence, as noted, the court inquired of counsel whether defendant would return to the court room. Counsel explained in camera, still in defendant's absence, that defendant was

51

upset and had expressed a strong desire not to be in the court room anymore. Counsel stated that he would waive defendant's presence during the hearing, adding that defendant was "not going to help himself in any way." The court suggested that it might be Cindi who was "triggering all of this," and that if defendant were absent from her testimony, he might be able to return thereafter. Defense counsel responded that other evidence might also be upsetting, and the court recommended that they reassess the situation if that turned out to be the case. Counsel apparently agreed, commenting that defendant had also been very upset when Cindi had testified at the preliminary hearing. Then the court explained to the prosecutor that it had suggested defendant remain outside the courtroom during Cindi's testimony. The prosecutor said she had no objection if defendant waived his right to be present. When the jury returned, the court explained that defendant had "elected" to be absent "at least" for the duration of Cindi's testimony and that the jury should not consider this or hold it against him.

Cindi's ensuing testimony — in defendant's absence — was to the effect that prior to the 911 call, defendant told her he was coming to her apartment, and that in response to the 911 call she and her sons were taken to the police station and kept in isolation without any information for more than two hours. She identified the weapons taken from the scene as either defendant's or her own property, described where they were purchased and where they had been kept in the home, and added that they were licensed. She stated that the couple had used separate bedrooms for about one year and had not had marital relations. She added that she had moved out of the family home about two weeks before the murders. She was aware that defendant kept cash in the amount of about $10,000 in the house, and that this money was the proceeds of the sale of some family property in Mexico. Cindi said that she was involved romantically with Chavez, who lived at her parents' house, and that they had become intimate a short time

52

before the murders. She said her children had had an acceptable relationship with Chavez. She identified defendant's van, helmet, and guns, and said she was aware of his bulletproof vest. She also identified a gas mask as one she had purchased at a garage sale. Cindi testified that defendant had stopped working some five or six years before the murders, and that she worked two jobs and paid him to take care of the children.

During cross-examination, defense counsel focused on photographs of the couple's children found in defendant's van, and evidence that the weapons had been in the house since 1995 or 1996 and had been kept locked up. Cindi testified that defendant had been keeping the cash from the property sale for their children, that he did not trust banks or the government, and that he had become very suspicious. She said defendant had never hit her or threatened her before, and that he did not take drugs or abuse alcohol. She said the tragedy came out of the blue and she never would have expected it.

On redirect examination, Cindi described defendant's mistrust of the police. She denied telling a police officer that at one time, defendant had said that if she did not leave the house, he would kill her. She conceded that there had been an argument in which the couple pushed each other and defendant had put his hands around her neck, though she did not know whether he was playing or was angry.

As for criminalist Hamiel's testimony, the record indicates no discussion or attempt to secure a waiver of defendant's presence in advance of the testimony. Rather, the following interchange — in which defendant played no part — occurred. After Hamiel's testimony concluded, the prosecutor asked whether the record should reflect defendant's absence during the testimony. The court stated: "Well, yeah. Following conference in chambers with defense counsel, it was decided that [defendant] was not in very good shape to continue listening to the testimony. We — I suggested to counsel that he be excused from attending at

53

least for the testimony of . . . Cindi Martinez, which was accepted by defense counsel." The prosecutor noted that the absence had continued during Hamiel's testimony and asked "And that was waived?" Defense counsel responded: "Yes, we continue our waiver of our client's presence for ballistics evidence that was put on here late this afternoon." The court noted its hope that defendant would return the following day.

The substance of Hamiel's testimony was that the shell casings and bullets found at the scene had been fired from the weapons also found there, and that all three of the weapons were semiautomatic, functioned properly, and had an average trigger pull.[4]

### 2. *Asserted statutory violation*

"[S]ection 1043, subdivision (a) provides that '[e]xcept as otherwise provided in this section, the defendant in a felony case shall be personally present at the trial.' Although, pursuant to section 1043, subdivision (b)(2), a felony trial that has commenced generally may continue if the defendant subsequently is voluntarily absent, this exception does not apply in capital cases. (§ 1043, subd. (b)(2).) Similarly, section 977, subdivision (b)(1) requires, in part, that defendants charged with a felony must be present 'during those portions of the trial when evidence is taken before the trier of fact.' Under that statute, a defendant is not permitted to waive his or her presence at that stage of the

---

**4** Defendant also notes that he also was absent pursuant to defense counsel's waiver after little discussion during various interchanges between court and counsel, including: (1) consideration of a jury questionnaire issue; (2) a brief colloquy on the first day of trial regarding when a motion would be entertained, (3) discussion of the wording of a guilt phase instruction; (4) discussion of evidentiary and instructional issues at the sanity phase; (5) stipulated excusal of a juror at the sanity phase; and (6) discussion of evidentiary matters and regarding spectator behavior at the penalty phase.

54

proceedings. [§ 977, subd. (b)(1); citation.] Thus, under the statutes, a capital defendant generally must be present during the trial when evidence is taken." (*People v. Rundle* (2008) 43 Cal.4th 76, 134 (*Rundle*).)

It is evident that the trial court erred under the applicable statutes when it permitted defendant to be absent during the playing of the 911 recording and the taking of testimony from Cindi and Hamiel. The People do not argue otherwise.

*3. Asserted constitutional violation*

The applicable law is settled. " 'As a constitutional matter, a criminal defendant accused of a felony has the right to be present at every critical stage of the trial. [Citation.] The right derives from the confrontation clause of the Sixth Amendment to the federal Constitution and the due process clauses of the Fifth and Fourteenth Amendments, and article I, section 15 of the California Constitution.' [Citation.]" (*Rundle, supra*, 43 Cal.4th at p. 133.) The constitutional right may be waived. "As with other constitutional rights, a capital defendant *may* waive his right to presence at trial, as long as his waiver is voluntary, knowing and intelligent under the standard set forth in *Johnson v. Zerbst* (1938) 304 U.S. 458, 464." (*People v. Davis* (2005) 36 Cal.4th 510, 531, italics added (*Davis*); see *Taylor v. United States* (1973) 414 U.S. 17, 18-20.)

What constitutes a knowing and intelligent waiver is less clear. We have noted an unsettled state of the law on the question whether a waiver by defense counsel is effective, but stated that "[a]t a minimum, there must be some evidence that the defendant understood the right he was waiving and the consequences of doing so." (*Davis, supra*, 36 Cal.4th at p. 532.) In the *Davis* case, we found no effective waiver of the right to be present during a pretrial evidentiary hearing when "defense counsel represented to the court that counsel had discussed the hearing with defendant and that defendant would waive his presence." (*Ibid.*) We commented that there was no evidence that counsel had informed the defendant of

55

his right to attend or that defendant understood that he would be unable to contribute to the discussion regarding the evidence if he was not present.  (*Ibid*.)  On the other hand, when the court has admonished the defendant that he had the right to be present and inquired regarding the waiver of that right, we have not accepted a claim that waiver is ineffective without additional admonition from the court regarding the importance of the decision to be absent.  We have said that "[d]efendant was represented by counsel, and he himself chose, for his own reasons, to leave the courtroom.  We find nothing improper about the procedure used. . . ."  (*People v. Weaver* (2001) 26 Cal.4th 876, 967.)

In another case, we found the waiver adequate in the context of defendant's absence from the taking of some evidence at the penalty phase when, after a recess, "defense counsel informed the court that defendant had informed him during the recess that he 'would just as soon not hear the testimony of [certain] witnesses.' "  (*People v. Young* (2005) 34 Cal.4th 1149, 1212 (*Young*).)  The court admonished the defendant, " 'you understand you have the right to be present or not be present.  That is your choice.  And has [counsel] correctly stated your position regarding future attendance here at the proceeding?' "  The defendant responded in the affirmative.  The court thereafter informed the jurors that defendant had exercised the right not to be present "and admonished them that they were not to speculate about defendant's exercising that right or allow it to affect their deliberations on the issue of penalty."  (*Id*. at pp. 1212-1213.)  On the merits, we said that the "record reflects that defendant was voluntarily absent" and we found "nothing improper about the trial court's acceptance of defendant's conduct as voluntary waiver of his presence."  (*Id*. at p. 1213.)  We were not swayed by evidence of defendant's " 'borderline level' " of intelligence in the absence of evidence he was unable to understand and waive his right.  (*Ibid*.)

"Moreover, counsel made no objection to defendant's waiver on this basis and thus did not preserve the issue for appeal." (*Ibid.*)

Applying the law to this case, we observe first that, because it is plain that defendant personally waived his presence in the court room during the playing of the recording of the 911 call, no constitutional error occurred with respect to that evidence. With respect to defendant's absence from the remainder of Cindi's testimony and that of Hamiel, however, the absence occurred on the basis of representations from counsel. Because it is unclear whether a waiver by counsel is effective in these circumstances, we will assume without deciding there was error and consider whether any error was prejudicial.

### 4. *Standard of review*

We first dispose of the claim — raised by defendant for the first time after oral argument — that any constitutional or statutory error constituted structural error that requires reversal without an examination of prejudice.

The high court traditionally takes a categorical rather than a case-by-case approach to defining constitutional error it designates as structural. (*Neder v. United States* (1999) 527 U.S. 1, 14 (*Neder*).) It has cautioned that most constitutional errors may be reviewed under a harmless error standard. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 306 (*Fulminante*).) " '[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.' " (*Neder*, *supra*, 527 U.S. at p. 8.) Only a " 'very limited class of errors' " is considered structural and requires automatic reversal. (*United States v. Davila* (2013) ___U.S. ___, ___ [133 S.Ct. 2139, 2149; 186 L.Ed.2d 139 [referring to structural errors as belonging to a "highly exceptional category"].) "Errors of this kind include denial of counsel of choice, denial of

self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt." (*Ibid.*) "Those cases . . . contain a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' [Citation.] Such errors 'infect the entire trial process' [citation], and 'necessarily render a trial fundamentally unfair' [citation]. Put another way, these errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.' " (*Neder*, *supra*, at pp. 8-9.) Such errors "defy analysis by 'harmless-error' standards." (*Fulminante*, *supra*, 499 U.S. at p. 309.)

The high court has never suggested that a defendant's improper absence from any critical stage of the proceedings constitutes structural error requiring reversal without regard to prejudice. On the contrary, it has listed such constitutional error as belonging to the broad class of errors that may be harmless. (*Fulminante*, *supra*, 499 U.S. at p. 307; *Rushen v. Spain* (1983) 464 U.S. 114, 117-118, fn. 2; see *People v. Perry* (2006) 38 Cal.4th 302, 312 (*Perry*); *Hovey v. Ayers* (9th Cir. 2006) 458 F.3d 892, 896, 903; *Campbell v. Rice* (9th Cir. 2005) 408 F.3d 1166, 1172-1173; *U.S. v. Arrous* (2d Cir. 2003) 320 F.3d 355, 361-362; *U.S. v. Watkins* (7th Cir. 1993) 983 F.2d 1413, 1422 (*Watkins*).)

Defendant claims a structural error standard applies to his case because he was absent from the *taking of testimony* rather than from an ex parte communication between judge and juror, as in the *Rushen* decision. But this circumstance does not mean that his absence during a limited period of testimony — with counsel's approval — necessarily affected the whole framework within which the trial proceeded (see *Neder*, *supra*, 527 U.S. at p. 8), or that any error defies analysis for prejudice (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; *Fulminante*, *supra*, 499 U.S. at pp. 309-310; *People v. Gamache* (2010) 48 Cal.4th

58

347, 396; *People v. Dickey* (2005) 35 Cal.4th 884, 924).  We are aware of no decision, and defendant cites none, establishing that a defendant's absence from the courtroom during the trial testimony of two witnesses based on a waiver or consent by counsel but without an effective personal waiver constitutes structural constitutional error requiring automatic reversal.  (See *Watkins*, *supra*, 983 F.2d at p. 1422 [defendant's absence during taking of evidence was prejudicial under *Chapman v. California* (1967) 386 U.S. 18]; *U.S. v. Toliver* (2d Cir. 1976) 541 F.2d 958, 965 [defendant's absence during the trial testimony of two witnesses was constitutional error, but the error was nonprejudicial].)  Defendant's reliance on decisions involving a deprivation of counsel is misplaced.  The high court has recognized that complete deprivation of counsel, *unlike* other constitutional violations, belongs to the small class of errors it recognizes as structural.  (*United States v. Marcus* (2010) 560 U.S. 258, 263; *Fulminante*, *supra*, 499 U.S. at p. 309.)  Defendant's absence from the courtroom during part of the testimony of one witnesses and the entire testimony of another — with the consent or acquiesence of counsel — does not necessarily render the adversary process " 'presumptively unreliable.' "  (*Roe v. Flores-Ortega* (2000) 528 US 470, 483 [using the phrase in the context of defense counsel's failure to file a notice of appeal].)

Defendant also claims that the statutory error should be viewed as structural error requiring automatic reversal, citing *People v. Blackburn* (2015) 61 Cal.4th 1113 (trial court's failure to obtain a valid jury trial waiver was statutory error and a miscarriage of justice requiring reversal without inquiry into prejudice).  But we have already made it quite plain that we apply a harmless error standard to statutory error under sections 1043 and 977.  (*Rundle*, *supra*, 43 Cal.4th at pp. 134-135; *People v. Riel* (2000) 22 Cal.4th 1153, 1196 (*Riel*); *People v. Mayfield* (1997) 14 Cal.4th 668, 738; *People v. Jackson* (1996) 13 Cal.4th 1164, 1211

59

(*Jackson*).) Defendant argues that in none of those decisions was the defendant both absent from testimony during the trial itself and absent without a personal waiver of his presence. We do not see why these circumstances would transform error from trial error to structural error, however, and defendant provides no convincing basis for such a conclusion.

Having rejected defendant's structural error claim, we reaffirm that review of any error under sections 977 and 1043 is conducted under the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836) — asking whether it is "reasonably probable a result more favorable to the defendant would have been reached in the absence of the error." (*Rundle*, *supra*, 43 Cal.4th at p. 134.)

"Under the federal Constitution, error pertaining to a defendant's presence is evaluated under the harmless-beyond-a-reasonable-doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 23.)" (*Davis, supra,* 36 Cal.4th 532; see *Perry*, *supra*, 38 Cal.4th at p. 312.)

*5. Harmless error*

We first conclude that defendant's absence during the playing of the recording of the 911 call was harmless under the *Watson* standard. Defense counsel had been in possession of the 911 tape recording long before the trial commenced, and Cindi had referred to it in her preliminary examination testimony in January 2003. (See *Davis*, *supra*, 36 Cal.4th at p. 533 [defense counsel's prior access to evidence gave them "ample opportunity to discuss the contents with defendant and to seek his assistance"].) In addition, a transcript of the call was introduced in evidence at trial while defendant was present. Moreover, the recording had been played *in defendant's presence* during the prosecutor's opening argument. Defendant had ample opportunity to offer counsel any insight he had — had he been willing to cooperate with counsel to that extent. Finally, in the defense opening statement, counsel commented that the defense evidence was

60

not going to change the picture presented by the recorded 911 call. There is no reasonable probability that if defendant had been present when the recording was played for a second time, a different verdict would have resulted.

We next consider whether any constitutional error arising from defendant's absence during the remainder of Cindi's testimony and that of Hamiel was harmless beyond a reasonable doubt.

With respect to defendant's absence for Cindi's testimony after the playing of the 911 recording, contrary to defendant's complaint that the trial court "failed to admonish the jury not to speculate or infer anything from [defendant's] absence," the court did so admonish the jury. That admonition helps to support the conclusion that any error was harmless. (*People v. Dickey*, *supra*, 35 Cal.4th at p. 924 [defendant's absence during certain testimony nonprejudicial under the higher "not reasonably possible" prejudice standard applicable to penalty phase error, relying in part on the court's admonition]; *Jackson*, *supra*, 13 Cal.4th at pp. 1211-1212 [defendant's absence nonprejudicial under the lower "reasonable probability" standard of review, relying in part on the court's admonition].)

In addition, of some relevance is defense counsel's statement that defendant was not going to do himself any favors by remaining during that testimony. (*Riel*, *supra*, 22 Cal.4th 1153, 1196 [noting relevance of counsel's views to issue of prejudice, albeit under the standard of review for statutory error].)

Most significantly, defendant's absence during Cindi's testimony was harmless in light of the very limited nature of defendant's defense and the fact that Cindi's testimony in favor of the prosecution was basically consistent with elements of the prosecution case that the defense had conceded. For example, it was not disputed that Mendoza killed the victims at their residence in the middle of the night using weapons and equipment he brought from his home. Apart from incriminating elements that he had conceded, Cindi's testimony was, if anything,

consistent with his defense that he was distraught and that he acted without premeditation.

Defendant contends that his presence during Cindi's remaining testimony "would have been extremely helpful in cross-examination of Cindi as [defendant] was the only person with knowledge relating to the matters testified to by Cindi," including defendant's relationship with her and their children, her relationship with Camarino Chavez, and evidence regarding the weapons and equipment owned by defendant.

Preliminarily, it is not true that defendant was the only person with knowledge of all the facts Cindi covered in her testimony; other witnesses, including Cindi's father and her sister, Guadalupe, were aware of and already had testified regarding the relationship between the couple and their children, and Cindi's relationship with Camarino Chavez. In addition, basic points concerning the couple's relationship and the events leading up to and following the murders had been covered, albeit without much detail, in Cindi's preliminary examination testimony. Moreover, defense counsel's opening statement demonstrates that, before Cindi testified, counsel already had gleaned from defendant the particulars that counsel sought to develop on cross-examination during her testimony, including evidence concerning defendant's relationship with Cindi and their sons, as well as the absence of any criminal record. Finally, because Cindi was excused subject to recall but was not recalled once defendant had returned to the courtroom, we infer that even after an opportunity to consult with defendant, counsel saw no need for further examination of Cindi.

In sum, it is not reasonably possible under the totality of the circumstances that if defendant had not been absent from the courtroom during Cindi's testimony, there would have been a more favorable verdict. (See *Rundle*, *supra*, 43 Cal.4th at p. 136.)

62

As for Hamiel's testimony, defendant claims that had he been present and "if he was competent, then he should have been able to assist counsel in formulating questions on cross-examination as to trigger pull, which was relevant to determining the degree of homicide." As noted, the defense did not dispute that defendant owned the firearms used in the murders. Evidence concerning whether each weapon had an average trigger pull could not possibly have affected any element in dispute. The jury had before it evidence that defendant had brought three loaded semiautomatic firearms along with ample extra ammunition and other equipment, to the home in the middle of the night, burst into the house through a front window, fired his weapons until they were empty and reloaded, expending at least 73 rounds as he shot through doors and shot off locks. The evidence was overwhelming that he separately pursued three victims to their deaths from close-range gunshot wounds to the head and body, then searched the home for an additional victim, Cindi's father. Trigger pull evidence could have had no impact on the jury's understanding that defendant had paused after killing two victims to interact with Guadalupe, used her to lure Alicia out of her bedroom, and then shot Alicia in the head at close range as she professed her love for him. Similarly, any evidence that the weapons had a difficult trigger pull could have had no impact on the verdicts in light of the multiple rounds fired at the door to Camarino's room and in the room itself, the multiple fatal gunshot wounds inflicted on him, and the statements overheard by Guadalupe regarding defendant's motive for killing Camarino.

Because there is no prejudice under *Watson* if there is no prejudice under the more rigorous harmless error test for assessing federal constitutional error, the violation of sections 1043 and 977 that occurred in this case is necessarily harmless.

63

## D. Asserted prosecutorial misconduct at the guilt phase

Defendant contends the prosecutor committed misconduct in violation of his state and federal constitutional rights to confrontation, due process, and a fair trial. He claims that in closing argument at the guilt phase of trial, the prosecutor improperly argued facts not in evidence and personally vouched for the prosecution's case. We reject his claim.

" 'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." [Citation.]' " (*People v. Clark* (2011) 52 Cal.4th 856, 960.) Even when the misconduct does not attain that level, it may be error under state law, but " ' "only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, . . . " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " [Citation.]' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1205 (*Linton*).) Generally, " '[t]o preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.' " (*Ibid.*) A failure to "object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm." (*Ibid.*) "[T]he absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' [Citations.]" (*People v. Hill* (1998) 17 Cal.4th 800, 820-821 (*Hill*).)

Defendant refers first to a guilt phase closing argument in which Deputy District Attorney Raynaud summarized evidence at the crime scene by emphasizing the perpetrator's determined efforts to gain ingress to the home, the many wounds the victims suffered, and evidence that there had been multiple shots from multiple weapons that were emptied in the course of the shootings. He said: "The house was a shooting gallery, folks. And those folks were like ducks in a barrel. [¶] Unlike so many other cases where — murder cases where there's an argument . . . ." At this point defense counsel objected, alleging "lack of foundation." The trial court overruled the objection and the prosecutor continued: "if you can envision a case where somebody gets in an argument with another person and tempers flare, somebody pulls a gun, shots are fired, one, two, maybe three shots, and when the smoke clears, somebody is dead, and there's a question and there's responses: Well I thought he had a gun. Well, I was just trying to scare him. Well, I didn't know it was loaded. [¶] Those are cases where there's a question as to whether or not there was an intent to kill, a question of malice aforethought. [¶] In this case, the amount of evidence that goes toward malice aforethought, manifestation of intent to kill, is absolutely overwhelming." Then the prosecutor went on to discuss many pieces of evidence that he argued demonstrated premeditation and deliberation, also mentioning the jury instructions and factual situations that would be "classic examples" of voluntary manslaughter and second degree murder.

Defendant contends these remarks impermissibly referred to facts not in evidence and vouched for the strength of the prosecution's case.

"Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before

65

the jury, corroborates the testimony of a witness." ' [Citations.]" (*Linton*, *supra*, 56 Cal.4th at p. 1207.)

In the present case, to the extent the claim is based upon improper vouching, it is forfeited. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1166 ["defendant's failure to raise a vouching objection at trial forfeits the claim on appeal"] disapproved on other grounds in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; *Hill*, *supra*, 17 Cal.4th at p. 820 [in order to preserve an objection for review, defense counsel must object to the misconduct " 'on the same ground' "].)

The objection based on lack of foundation served to preserve the claim that the prosecutor asserted facts not in evidence. Although defense counsel failed to request an admonition, the failure is excused because the objection was quickly overruled. (*Hill*, *supra*, 17 Cal.4th at pp. 820-821.)

It is well settled that it is misconduct for a prosecutor to base argument on facts not in evidence. (*Linton*, *supra*, 56 Cal.4th at p. 1207.) We do not find, however, that the prosecutor committed such misconduct in this case. The prosecutor made the claim — based entirely on the evidence — that the crime occurred in what looked like a "shooting gallery." He made the point that the perpetrator had made a concerted effort to get into the house in the middle of the night and had emptied three fully loaded firearms and additional ammunition into the victims and the walls. In order to make a legitimate point concerning defendant's state of mind, the prosecutor sought to distinguish these established facts from a hypothetical situation in which there might be a burst of shots and then some debate about whether the perpetrator might have acted in self-defense or even by accident. In order to illustrate the concept of malice, the prosecutor compared the facts of the case with common, obviously hypothetical scenarios that jurors readily could posit for themselves. The argument sought to distinguish a

66

case in which malice aforethought might be in question from the defendant's case, in which, the prosecutor argued, the facts on the record demonstrated there could be no such question. The use of hypotheticals is not forbidden and there is no misconduct when, as here, "[n]o reasonable juror would have misunderstood the expressly hypothetical example to refer to evidence outside the record." (*People v. Davis* (1995) 10 Cal.4th 463, 538; accord, *People v. Barnett* (1998) 17 Cal.4th 1044, 1141.)

In any event, even if the vouching claim were preserved, it would be without merit because the comment would not be understood to refer to facts available solely to the government or to the prosecutor's personal knowledge or beliefs or the prestige of her office. (See *Linton*, *supra*, 56 Cal.4th at p. 1207; *People v. Williams* (1997) 16 Cal.4th 153, 257.)

Defendant also complains of a statement in the rebuttal portion of the prosecutor's argument. The defense had argued there was reasonable doubt concerning the elements of premeditation and deliberation, pointing in part to evidence of defendant's deteriorating mental condition, especially in the days and hours before the crimes. The defense reminded the jury that defendant's marriage was falling apart, that he was anguished over the loss of his children, and that he had become deeply depressed and unusually distraught.

Deputy District Attorney Raynaud sought to counter the defense argument, beginning the rebuttal as follows: "Everybody who commits murder has a particular reason: Greed, lust, anger, jealousy, revenge. Everybody before they commit murder has to have a reason. And why that reason finally hits and ripens to the point where that person comes to grips with what they're going to do and they decide to do it and take action, it is an ugly emotion. It is an ugly state of mind. [¶] But *nobody who goes out and intentionally takes a life does it when they're all right in the head*. I'm not going to sit here and tell you that [defendant]

67

was calm and happy and everything was wonderful in his life before he went out and murdered those folks. That's not the case." (Italics added.)

Defendant claims that the prosecutor referred to evidence outside the record and improperly vouched for the strength of his case when he uttered the italicized phrase.

Because there was no objection on any ground, nor would an objection have been futile, the claim is forfeited. (*Linton*, *supra*, 56 Cal.4th at p. 1205.) Although, as we have seen, the court overruled one of counsel's objections, with respect to counsel's sole other objection, the court responded by ordering the prosecutor to rephrase his argument. There is no evidence to suggest that the court would have been predisposed to rule against defendant on subsequent objections.

Moreover, even had the issue been preserved, we would find no misconduct. When considered in context, the argument was essentially an appeal to common sense — to the idea that no one who intentionally kills in a domestic setting is in a normal or calm state of mind. From this commonsense point, the prosecutor sought to persuade the jury that although defendant was distraught, he remained responsible and had premeditated. "Counsel may argue facts not in evidence that are common knowledge or drawn from common experiences." (*Young*, *supra*, 34 Cal.4th at p. 1197.) Contrary to defendant's claim, the prosecutor was not suggesting the existence of any facts unknown to the jury, nor was he trading on the prestige of his office.

### E. Constitutional challenges to sentence on the basis of evidence of mental illness

Defendant contends imposition of the death sentence on him is impermissible under the Eighth Amendment's prohibition against cruel and unusual punishment and violates the guarantee of due process of law, because defendant "was seriously mentally ill at the time of the offenses and at trial."

68

Defendant made a similar claim at trial, also citing *Atkins v. Virginia* (2002) 536 U.S. 304, which holds that the Eighth Amendment prohibits imposition of the death penalty on mentally retarded persons, and *Roper v. Simmons* (2005) 543 U.S. 551, which reached a similar conclusion with respect to persons who were juveniles at the time of their offenses. The trial court rejected the claim.

To the extent defendant's claim on appeal is that persons who are "severely" mentally ill may not constitutionally be subject to the death penalty by analogy to *Atkins* and *Roper*, we have rejected similar claims based on the rationales of those cases. In *People v. Hajek and Vo* (2014) 58 Cal.4th 1144 (*Hajek and Vo*), a case in which defendant Hajek presented evidence of his cyclothymic and bipolar disorders, we observed that the defendant had "identifie[d] no controlling federal authority barring imposition of the death penalty on mentally ill offenders." (*Id*. at p. 1251.) Defendant's argument suffers from the same deficit in authority.

In *Hajek and Vo*, *supra*, 58 Cal.4th 1144, we analyzed the claim in light of a prior decision of this court, *People v. Castaneda* (2011) 51 Cal.4th 1292, an opinion that considered the problem in light of both *Atkins* and *Roper*. The *Castaneda* decision had rejected the claim that antisocial personality disorder was "analogous to mental retardation or juvenile status for purposes of imposition of the death penalty." (*Castaneda*, *supra*, 51 Cal.4th at p. 1345.) As we explained the *Castaneda* analysis in *Hajek and Vo*, in contrast to the action of many state legislatures forbidding execution of mentally retarded persons, no " 'objective evidence' " indicated the same view with respect to persons having an antisocial personality disorder. (*Hajek and Vo, supra*, at p. 1251.) We recalled that the *Castaneda* decision commented that members of the latter class of persons have greater personal culpability for crime because they retain more awareness and personal autonomy than mentally retarded persons. (*Ibid*.) Moreover, the

69

*Castaneda* decision had said, " 'the justifications for the death penalty — retribution and deterrence — may be served by application of the law to such individuals.' " (*Hajek and Vo, supra*, at p. 1251.)

We concluded that the same analysis applied to defendant Hajek's claims, and indeed reached a holding that is of broader application than the particular mental illness — antisocial personality disorder —  exhibited by Castaneda or the bipolar and cyclothymic disorders exhibited by Hajek.  "Most significantly, the circumstance that an individual committed murder while suffering from a serious mental illness that impaired his judgment, rationality, and impulse control does not necessarily mean he is not morally responsible for the killing.  There are a number of different conditions recognized as mental illnesses, and the degree and manner of impairment in a particular individual is often the subject of expert dispute.  Thus, while it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment, there is likely little consensus on which individuals fall within that category or precisely where the line of impairment should be drawn.  Thus, we are not prepared to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence.  We leave it to the Legislature, if it chooses, to determine exactly the type and level of mental impairment that must be shown to warrant a categorical exemption from the death penalty." (*Hajek and Vo*, *supra*, 58 Cal.4th at p. 1252; accord, *People v. Boyce* (2014) 59 Cal.4th 672, 722 (*Boyce*) [confirming that we have refused to extend *Atkins* to "mental illness in general"].) That broad holding applies in the present case as well — especially considering that in this case the jury, after a separate trial involving copious testimony from mental health experts, rejected defendant's claim that he was not culpable for the murders on the ground of insanity as defined by our law, and at the penalty phase

70

rejected his argument that because of his mental illness the death penalty was not warranted.

We also decline to reconsider the position we took just one year ago in *Hajek and Vo*, *supra*, 58 Cal.4th 1144, simply because defendant has identified observations dating back several years from members of the psychiatric profession urging that mentally ill persons not be eligible for the death penalty, or a 2002 poll assertedly showing that 75 percent of respondents stated that they "opposed the death penalty when asked whether they favored or opposed it for the 'mentally ill.' " Nor are we prepared to reconsider on the basis of defendant's incomplete citations to United Nations sources and his accompanying undeveloped argument. For example, he cites United Nations Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty (Economic & Soc. Council res. No. 1984/50, annex, No. 1 1984 U.N. ESCOR Supp. at p. 33, U.N. Doc. E/1984/84 (May 25, 1984)), for the proposition that "the execution of those with severe mental illness is prohibited by international law, and by virtually every country in the world." In fact the cited document does not speak in terms of "severe mental illness." Rather, it states that persons who committed their crimes before they were 18 years of age should not be sentenced to death "nor shall the death sentence be *carried out* . . . on persons who have *become insane*." (*Ibid*.; italics added.) Defendant was found by a jury not to have been insane at the time of commission of the crime. If he becomes insane he is not subject to execution under existing federal law (*Ford v. Wainwright* (1986) 477 U.S. 399; see *Panetti v. Quarterman* (2007) 551 U.S. 930 [discussing elements of competency to be executed]), although that question will be determined after his execution date is set. (*Leonard*, *supra*, 40 Cal.4th at p. 1430.)

Defendant argues that in addition to considerations involving retribution, deterrence, and emerging community standards, *Atkins* and *Roper* asked whether

there was an enhanced risk of unjustified or mistaken execution in the case of juveniles and persons with intellectual disabilities. He argues that the same considerations apply in cases of mental illness, especially as manifested at trial, maintaining that "the record here is replete with evidence of how [defendant's] illness reduced his ability to assist and to trust counsel, thus heightening the risk of an unjustified death sentence." Defendant's briefing also argues that his mental illness "made him unable to conform his conduct to the requirements of courtroom procedure and decorum: he sobbed; he swore; he had outbursts. For these same reasons, his attorneys did not believe he would make a good witness, even though his testimony otherwise could have been helpful." To the extent the claim is that the penalty was unwarranted under the facts of this particular case, we consider that issue under the appropriate legal standard below. To the extent this is an argument that mental illness or even "serious" mental illness presents a risk of an "unjustified death sentence," such that the mentally ill must be categorically exempted from the reach of the death penalty by analogy to *Roper* and *Atkins*, we are not persuaded. All defendants, including this one, have the opportunity to establish that they are not competent to stand trial. Moreover, defendant has not argued convincingly that impaired competence of the sort faced by persons who are minors or who have particular intelligence measurements and developmental history is so widespread among all types of serious mental illnesses that all those so diagnosed must be spared the death penalty. And unlike the benchmarks that courts apply in the case of persons with intellectual disability or the simple age measurements that exist for establishing minority, defendant does not offer a definition of what level of mental illness would constitute serious mental illness.

Regarding defendant's claim that, because of his mental illness, the sentence is so disproportionate to his individual culpability that it violates state and federal constitutional prohibitions against cruel and/or unusual punishment,

72

our conclusion after conducting intracase proportionality review is that the argument fails. " ' "The cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution prohibits the imposition of a penalty that is disproportionate to the defendant's 'personal responsibility and moral guilt.' [Citations.] Article 1, section 17 of the California Constitution separately and independently lays down the same prohibition." ' [Citations.] To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including . . . age, prior criminality, and mental capabilities. [Citation.] If the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], so that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*People v. Lucero* (2000) 23 Cal.4th 692, 739-740 (*Lucero*).)

In the present case, defendant, then 37 years of age, invaded the home of his wife's family in the early hours of the morning as they slept, equipped with a sledgehammer, three firearms, copious amounts of ammunition, a gas mask, a bulletproof vest, camouflage clothing, and a pair of handcuffs. He killed his wife's cousin upon entry, then sought out her lover and killed him in a blaze of semiautomatic weapon fire. He then used his young sister-in-law to lure his mother-in-law from behind a locked door to her death, using the false promise that he would not hurt the older woman. His motives included jealousy and anger that his children had, as he thought, been exposed to his wife's love affair in the home. He injured his sister-in-law with his indiscriminate fire, but was aware enough of

73

what he was doing to decide not to kill her too. He complied with her request that he take her to the hospital only after he had accomplished another errand. In consequence of his murders within the family, his sons and the rest of the family suffered grievous losses, including depriving his sons of his own apparently tender care as a father.

Defendant asked the jury to evaluate his culpability in light of considerable evidence of a relatively long-standing and untreated depression accompanied, some of the experts said, with psychotic features. Defendant urged the jury that this evidence, along with evidence of the emotional turmoil that preceded the crime, should reduce the degree of the crime, but the jury was not persuaded. Defendant urged the jury to consider even more detailed psychiatric evidence to determine whether he should be held criminally responsible at all, or whether he should be found to have been insane at the time of the crimes. The jury, having considered the evidence, determined that he was sane. Finally, the jurors considered the evidence of defendant's mental illness, along with evidence indicating the absence of any criminal record or record of substance abuse, and defendant's positive characteristics, in connection with their penalty determination. Again, the jury concluded that despite this evidence, the death penalty was warranted. We cannot say, under the facts before us, and in light of the careful consideration already accorded to defendant's evidence of mental illness at the trial level, that the penalty is grossly disproportionate to defendant's culpability such that it " ' " 'shocks the conscience.' " ' " (*Lucero*, *supra*, 23 Cal.4th at p. 740.)

We also reject defendant's claim that it offends the guarantees of equal protection and due process of laws to spare minors and those with certain intellectual disabilities from the death penalty, but not to accord the same treatment to mentally ill persons. As we explained in *Boyce*, in rejecting the same

analogy to *Atkins*, these constitutional principles afford " 'equality under the same conditions, and among persons similarly situated,' " but do not require that " ' "things . . . different in fact or opinion [must] be treated in law as though they were the same.'" ' " (*Boyce, supra*, 59 Cal.4th at pp. 722-723.)

### F. Constitutionality of the death qualification process in jury selection

In a challenge to both the guilt and the penalty phase verdicts, defendant asks us to declare that the process of excluding jurors who would not impose the death penalty violates multiple constitutional provisions, including the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and article I of the California Constitution. He asks us to reconsider the factual and analytical basis for decisions permitting exclusion of such jurors for cause such as *Hovey v. Superior Court* (1980) 28 Cal.3d 1, *People v. Fields* (1983) 35 Cal.3d 329, and *Lockhart v. McCree* (1986) 476 U.S. 162 (*Lockhart*). He alleges that excluding persons opposed to the death penalty in all cases generally has a "negative impact on the racial, gender, and religious composition of juries." He asserts equal protection violations because capital defendants receive different, more conviction-prone juries than other defendants. He also argues without any factual basis that prosecutors commonly abuse the death-qualification process to increase the chance of securing a conviction. He asserts that the death-qualification process fails to produce the heightened reliability required for death judgments under *Woodson v. North Carolina* (1976) 428 U.S. 280, 305, and that it also violates the right to jury trial. Defendant also argues that in the present case, the prosecutor "systematically" used peremptory challenges to exclude jurors who were "not excludable for cause" but "had reservations about the death penalty." He argues that the process of death qualification in California is unconstitutional

75

because the questioning process permitted by *Hovey* and *Fields* "persuades jurors to adopt pro-conviction and pro-death views."

Defendant cites nothing in the record indicating that he raised any of these arguments or challenges in the trial court at any point, and does not dispute the Attorney General's contention that no objection was made, nor does he make any reply to the Attorney General's contention that the claims thereby were forfeited. Our review of the record has not disclosed any objections on any of the bases mentioned in defendant's briefing.

Defendant's claims against the general propriety of questioning prospective jurors regarding their views concerning the death penalty, permitting challenges for cause as to persons who would be unable to impose the death penalty in any circumstances, and permitting the exercise of peremptory challenges against persons with apparent reservations concerning the death penalty, are forfeited because they were not raised below. (*People v. Tully* (2012) 54 Cal.4th 952, 1066 (*Tully*); *People v. Howard* (2010) 51 Cal.4th 15, 26 (*Howard*); *People v. Jennings* (2010) 50 Cal.4th 616, 687-688 (*Jennings*); *People v. Gurule* (2002) 28 Cal.4th 557, 597 (*Gurule*).)

In any event, as defendant acknowledges these challenges have been rejected on the merits in many decisions of this court. Defendant has not produced any compelling reason for a different result. (*People v. Taylor* (2010) 48 Cal.4th 574, 602-604 (*Taylor*), and cases cited; see *Tully*, *supra*, 54 Cal.4th at p. 1066; *Howard, supra*, 51 Cal.4th at p. 26; *Jennings*, *supra*, 50 Cal.4th at pp. 686-688; *People v. Mills* (2010) 48 Cal.4th 158, 172 (*Mills*); *People v. Salcido* (2008) 44 Cal.4th 93, 144.) As we summarized in *Howard*: "The death qualification process is not rendered unconstitutional by empirical studies concluding that, because it removes jurors who would automatically vote for death or for life, it results in juries biased against the defense. [Citations.] [¶] *Lockhart*[, *supra,*] 476 U.S. 162

76

. . . , which approved the death qualification process, remains good law despite some criticism in law review articles. [Citations.] 'We may not depart from the high court ruling as to the United States Constitution, and defendant presents no good reason to reconsider our ruling[s] as to the California Constitution.' [Citation.] [¶] The impacts of the death qualification process on the race, gender, and religion of the jurors do not affect its constitutionality. [Citations]. Nor does the process violate a defendant's constitutional rights, including the Eighth Amendment right not to be subjected to cruel and unusual punishment, by affording the prosecutor an opportunity to increase the chances of getting a conviction. [Citations.] Defendant claims the voir dire process itself produces a biased jury. We have held otherwise. [Citation.] [¶] Death qualification does not violate the Sixth Amendment by undermining the functions of a jury as a cross-section of the community participating in the administration of justice. [Citations.] Finally, defendant's constitutional rights were not violated by the prosecutor's use of peremptory challenges to exclude jurors with reservations about capital punishment. [Citation.]" (*Howard*, at pp. 26-27; see *Taylor*, at p. 602 [rejecting argument for reconsideration on the basis of "current empirical studies" assertedly demonstrating that death-qualified juries are conviction and death prone ]; *Salcido*, at p. 144 [" '[s]kepticism about the death penalty is a permissible basis for a prosecutor's exercise of a peremptory challenge' "]; *Gurule*, *supra*, 28 Cal.4th at p. 597 [prosecutor's use of peremptory challenges to excuse death doubtfuls not improper]; *People v. Lenart* (2004) 32 Cal.4th 1107, 1120 [rejecting argument that death qualification results in a jury that is not a fair cross-section of the community]; *People v. Jackson, supra*, 13 Cal.4th at pp. 1198-1199 [even if death qualified juries are shown to be more conviction prone, it does not follow that the process is constitutionally prohibited]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1279 [death qualification process does not violate 14th

Amend. right to fair trial]; *People v. Carrera* (1989) 49 Cal.3d 291, 331, 333 [death qualification does not violate right to fair and impartial jury]; *People v. Johnson* (1989) 47 Cal.3d 1194, 1214-1215 [death qualification process not shown to result in underrepresentation of African-Americans on juries].)

Defendant does not argue on appeal that the court erred in granting any specific challenge for cause made by the People under the authority of *Witherspoon*/*Witt*. He argues that the use of peremptory challenges in his own case demonstrated systematic exclusion of persons with reservations concerning the death penalty, mentioning peremptory challenges to three potential jurors as evidence, but as noted, the prosecution is permitted to peremptorily challenge prospective jurors on the basis of their attitudes toward the death penalty, and in any event, any claim based on these peremptory challenges was not preserved for appeal. (*Gurule*, *supra*, 25 Cal.4th at p. 597.)

### G. Common challenges to California's death penalty scheme.

Defendant raises a number of challenges to California death penalty law that he acknowledges have been rejected in many prior decisions. We respond briefly.

"The jury's consideration of the circumstances of the crime (§ 190.3, factor (a)) does not permit imposition of a death sentence in an arbitrary and capricious manner in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. [Citations.] [¶] California's death penalty law does not violate the Sixth Amendment right to a jury trial, the Eighth Amendment prohibition against cruel and unusual punishment, or the Fourteenth Amendment right to due process for failing to require proof beyond a reasonable doubt that aggravating factors exist, outweigh the mitigating factors, and render death the appropriate punishment. [Citations.] 'The federal Constitution is not violated by the failure to require a penalty phase jury to reach unanimity on the

78

presence of aggravating factors [citation], or on whether prior violent criminal activity has been proved. [Citation]' [Citation.] The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 do not change this result. [Citations.]" (*Boyce*, *supra*, 59 Cal.4th at pp. 723-724.)

"This court and the United States Supreme Court have repeatedly rejected the claim that separate [guilt and penalty phase] juries are required because jurors who survive the jury selection process in death penalty cases are more likely to convict a defendant." (*People v. Davis* (2009) 46 Cal.4th 539, 626; accord, *People v. Hawthorne* (1992) 4 Cal.4th 43, 77.)

Section 190.3, factor (i) does not violate the due process clause or Eighth Amendment of the federal Constitution in that it permits consideration of defendant's age without guidance on the relevance of the factor. (*Mills*, *supra*, 48 Cal.4th at p. 214; *People v. Smithey* (1999) 20 Cal.4th 936, 1004-1007.)

CALJIC No. 8.85 is not unconstitutionally vague. (*People v. Williams* (2013) 56 Cal.4th 630, 697 ["The jury need not . . . find beyond a reasonable doubt that an aggravating circumstance is proved (except for § 190.3, factors (b) & (c)), find beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, or find beyond a reasonable doubt that death is the appropriate penalty"].) "The use of certain adjectives such as 'extreme' and 'substantial' in the list of mitigating factors in section 190.3 does not render the statute unconstitutional." (*People v. Thompson* (2010) 49 Cal.4th 79, 144; accord, *People v. Adams* (2014) 60 Cal.4th 541, 579.) "The court need not instruct the jury that mitigating factors can be considered only in mitigation, or to omit mitigating factors that do not apply to defendant's case." (*Boyce*, *supra*, 59 Cal.4th at p. 724.)

Contrary to defendant's claim, "[t]he death penalty law adequately narrows the class of death-eligible defendants." (*Boyce*, *supra*, 59 Cal.4th at p. 723.)

"The failure to instruct the jury that the prosecution bears some burden of persuasion regarding the jury's penalty determination does not violate the Sixth, Eighth or Fourteenth Amendment." (*Taylor*, *supra*, 48 Cal.4th at p. 662.) "There is no requirement for a jury in a capital case to make written findings." (*People v. Martinez* (2010) 47 Cal.4th 911, 967.)

"The trial court need not instruct the jury that a life sentence is mandatory if circumstances in aggravation do not outweigh those in mitigation." (*People v. Davis*, *supra*, 46 Cal.4th at p. 628.)

"Our state death penalty statute is not unconstitutional for failing to require intercase proportionality review or disparate sentence review." (*People v. Eubanks* (2011) 53 Cal.4th 110, 154 (*Eubanks*).)

"The imposition of the death penalty in accordance with state and federal constitutional and statutory law does not violate international law or the Eighth Amendment to the federal Constitution." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 469.) Nor does the accumulation of all the above unmeritorious claims regarding the constitutionality of our death penalty scheme indicate any violation of the Eighth or Fourteenth Amendment. (*Eubanks*, *supra*, 53 Cal.4th at p. 154.)

### H. Delay in notification of Mexican consulate

Defendant contends a violation of article 36 of the Vienna Convention on Consular Rights, April 24, 1963, 21 U.S.T. 77 (Vienna Convention) occurred when the police neither notified him at the time of his arrest of his right as a Mexican national to contact the Mexican consulate, nor promptly notified the consulate of his arrest. He asserts that prejudice cannot be determined on the

80

appellate record and raises the issue simply to preserve it for review by way of petition for writ of habeas corpus. We agree that is the appropriate procedure by which to raise the claim.

As is our practice with claims of this nature, we assume without deciding that article 36 of the Vienna Convention created rights enforceable by individuals. (See *In re Martinez* (2009) 46 Cal.4th 945, 957, fn. 3.) Defendant does not assert that he can establish prejudice on this record. Rather, he believes it is possible there is evidence outside the record on appeal demonstrating prejudice, including, for example, that timely intervention of the consulate could have affected the decision whether to seek the death penalty, and a more timely contact would have permitted the consulate to discuss the case, especially circumstances in mitigation, with defendant before his mental condition assertedly declined materially. It is evident that his current view of the prejudicial impact of the violation is broader than it was in his pretrial motion, as is his view concerning the broad range of potential remedies. Defendant explains that he has asserted the basis for the claim in the current proceeding to avoid any procedural bar to raising the claim in a petition for writ of habeas corpus.

We agree with defendant that a claim concerning the asserted prejudicial effect of a violation of article 36 of the Vienna Convention that is based on material outside the record on appeal appropriately should be raised in a petition for writ of habeas corpus. (*People v. Mendoza* (2007) 42 Cal.4th 686, 710.) Contrary to the People's claim, we cannot say that the appellate record demonstrates that there is no possibility that evidence outside the record might demonstrate prejudice. For example, the People's argument that defendant inevitably would have been capitally charged because of the nature of the crimes without respect to any intervention on the part of the Mexican consulate is speculative on this record.

81

## III. CONCLUSION

For the foregoing reasons, the judgment is affirmed in its entirety.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mendoza

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S143743
**Date Filed:** February 11, 2016

_____

**Court:** Superior
**County:** Stanislaus
**Judge:** John G. Whiteside

_____

**Counsel:**

Kathy Moreno, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell, Stephanie A. Mitchell and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kathy Moreno
P.O. Box 9006
Berkeley, CA 94709
(510) 717-2097

Christina Hitomi Simpson
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 323-1213